**Jeffrey W. McELROY, Appellant,**

v.

**Mary M. McELROY, Respondent.**

**No. 66817.**

Missouri Court of Appeals,
Eastern District,
Division Three.

Nov. 21, 1995.

---

Charles E. Bridges, Bridges & Nichols, St. Charles, for appellant.

Michael A. Turken, Cundiff, Turken & Londoff, St. Charles, for respondent.

GARY M. GAERTNER, Judge.

Appellant, Jeffrey W. McElroy ("father"), appeals the judgment of the Circuit Court of St. Charles County, denying his request to remove his minor children from the state, granting respondent's, Mary M. McElroy ("mother"), petition to transfer custody of the minor children to her, ordering father to pay $690.00 in monthly child support in addition to other sums, and granting father specific periods of visitation and custody. We affirm in part, and reverse and remand in part.

Mother and father were divorced on March 1, 1991. Two children were born during the marriage, J.M., born April 17, 1983, and G.M., born March 12, 1986. Pursuant to a stipulation entered into at the time of the dissolution, the parties were to share joint legal custody of the children, while father was to have primary physical custody. The agreement provided this placement would be subject to mother's right to "reasonable custody as the parties may agree."[1] The agree-

---

1. At the time the parties divorced, father had to travel out of town approximately half of every

ment was silent as to payment of child support.

Father remarried in January, 1992. Shortly before the marriage, he considered starting his own business as Chris, his new wife, was employed and making $70,000 a year. However, upon returning from the honeymoon, he and Chris learned she had lost her job. Father put his plans on hold in order to maintain a steady income.

In March, 1992, father decided to leave his current job because the travel it required aggravated a serious sinus condition. Father testified he looked for employment in the St. Louis area but was unsuccessful. In early May, he found a job paying $42,000 a year in Fairfield, Iowa. Fairfield is approximately thirty miles from the Missouri border. Father decided he would commute to Fairfield beginning at the end of May. Meanwhile, Chris had found a temporary position in St. Louis. Her job did not become permanent, and in the second week of July, 1992, father moved the family to Kahoka, Missouri, a town fifteen miles from the Iowa border.

In May, 1992, mother filed her motion requesting the court grant her specified rights of visitation and temporary custody. After mother learned of father's and the children's move, she filed an amended motion requesting the court transfer custody of the children to her.

In August, 1992, father enrolled J.M. and G.M. in the Fairfield public school system. This required a fifty-mile commute for the children each way to and from school. In September, upon comments from the children's teachers on the effect of the long drive on J.M. and G.M., father decided to move the family to Fairfield. Although he rented a home in Fairfield and maintained his residence in Kahoka, Missouri, he effectively resided exclusively in Fairfield, Iowa, as of October, 1992. Father filed his motion for leave to remove the children from Missouri on September 4, 1992, but no hearing took place before the move. The hearing took place almost two years later, beginning on April 19, 1994.

---

month. It was during this time that mother would have custody of the children.

Both J.M. and G.M. testified at trial. J.M. was eleven years old at the time of the trial. She testified that she would probably rather live with her mother than with her father, although she would miss her halfbrother (father's and Chris's baby), and would like to see him often. She stated she can confide in her mother while she does not feel she can with her father or his wife. Both J.M. and G.M. testified father questions them about the details of their stays with mother, and testified father has told them that if they live with mother they will have to live in an apartment and go to daycare so that they will hardly see her. G.M. was eight years old at the time of the trial. He testified he really wants to live with mother and always has. He also stated he feels comfortable with mother but not with father.

Mother offered the deposition of Dr. John Forhetz, a psychologist who interviewed the children twice with respect to the custody dispute. Dr. Forhetz stated that, although the children had "a sense of attachment to both parents," the children appeared to have a greater "connectedness" to mother that was missing with father. This connectedness manifested itself in the form of separation anxiety whenever the children left mother to return to father.

Father offered the testimony of Dr. Wells Hively, a psychologist who tested and conducted several interviews with the children, as well as with father and Chris. Dr. Hively testified that emotionally, both children are "anxious, inhibited, shy and fearful of having things lost in their lives." He stated both children "work very hard to be appropriate and proper and not to offend anyone in their lives, either their mother or their father." Furthermore, the children's "reservedness" had increased since the first time that he interviewed them, in August, 1992. Furthermore, with respect to G.M., Dr. Hively testified that he is very shy and inhibited, expressing a constant loneliness for his mother, and probably has "feelings of depression."

Both mother and father testified. Much of this testimony established the periods of visitation and custody exercised by mother after the divorce and up until the trial. The testimony reflected the difficulty the parties had in setting a custody schedule and revealed father's often recalcitrant attitude or reluctant cooperation.

At the end of the trial, the court denied father's petition to remove the children from Missouri and transferred custody from father to mother, finding this to be in the best interests of the children. While not making detailed findings of fact and conclusions of law, the trial court did note it found father's testimony to be not credible and further found father had interfered with mother's relationship with the children. The court established a visitation and custody schedule, and also ordered father to pay $690.00 in monthly child support, to pay seventy percent of child's medical expenses not covered by insurance, and to pay seventy percent of mother's work-related childcare costs. Father asserts four points on appeal; we will address each point in turn.

■ Our review is controlled by the standard set out in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We will affirm the judgment of the trial court if it is based on substantial evidence, not against the weight of the evidence, and not based on an erroneous interpretation or application of the law. *Id.* We set aside the judgment of the trial court only if we have a firm belief the judgment is wrong. *Wild v. Holmes*, 869 S.W.2d 917, 918 (Mo.App.E.D.1994). Furthermore, in child custody cases, great deference must be given to the trial court, even more so than in other cases. *Basler v. Basler*, 892 S.W.2d 749, 750 (Mo.App.E.D.1994).

■ Father first contends the trial court abused its discretion in denying his request to remove the minor children from Missouri. He relies on the apparent trend of the courts to allow such moves, as the courts recognize the need for flexibility in today's mobile society. *See In re Marriage of Greene*, 711 S.W.2d 557, 564 (Mo.App.S.D.1986). However, each case must be decided on its particular facts, and where the custody of a child is at issue, the child's welfare is the primary concern. *Riley v. Riley*, 904 S.W.2d 272, 275 (Mo.App.E.D.1995). Thus, we cannot say the trial court erred in denying father's motion.

■ The court considers four factors when determining whether removal of a minor is in the child's best interest. *See Wild,* 869 S.W.2d at 919; *Michel v. Michel,* 834 S.W.2d 773, 777 (Mo.App.S.D.1992). We apply those factors here.

■ First, the court examines the prospective advantages of the move in improving the quality of life for the children and the custodial parent. In this case, while we cannot say the quality of life improved, it certainly did not diminish. At school, the children performed at the same levels as they did before removal. J.M., who is consistently a straight-A student, was part of an accelerated program, in which she also had the opportunity to participate in St. Louis. G.M., an average student, was likewise performing at his ability. It appeared that, economically, the move may have been necessary. This would tend to maintain if not improve their economic situation. Therefore, the first factor weighs slightly in father's favor.

■ The second factor considered by the court is the integrity of the custodial parent's motives in relocating and whether one of them is primarily to defeat or frustrate visitation, and whether the custodial parent is likely to comply with substitute visitation orders. We find this factor weighs in favor of mother. Although father testified it was necessary for him to accept employment in Fairfield after an unsuccessful search of the St. Louis area, father was unable to give the names of these prospective employers, nor did he reply to mother's discovery requests for documents concerning this job hunt. Furthermore, the trial court specifically noted it did not find father's testimony credible. Lastly, the difficulty experienced by the parties in setting up visitation schedules after father moved the family, due largely in part to father's refusal to confirm dates ahead of time or to change them after they had been confirmed, defeats father's argument.

■ The third factor the court examines is the non-custodial parent's motive for opposing relocation and the extent to which it is to secure a financial advantage with respect to child support. The record does not support father's assertion that mother opposed removal of J.M. and G.M. in order to obtain a financial advantage. Neither parent was obligated to pay child support under the stipulation entered into by the parties at the divorce, thus mother was not using her opposition to the move to defeat a support obligation. Rather, mother opposed the move due to the close ties she had with her children.

■ The fourth factor the court considers is the realistic opportunity for visitation which will provide an adequate basis for preserving and fostering the non-custodial parent's relationship with the children. Before father moved the children, mother was very active in the children's lives. She signed them up for sports and attended games, led J.M.'s girl scout troop, participated in school conferences and meetings, as well as served as caregiver at home. *See Tucker v. Tucker,* 778 S.W.2d 309, 312 (Mo.App.W.D.1989). The testimony of the two psychologists, especially that of Dr. Forhetz, reflected the children's deep attachment to mother and their need and desire to have frequent contact with her. Father's removal of the children severely limited this contact. Therefore, based on an analysis of the four factors, we cannot say the trial court's action was an abuse of discretion.

■ Father's second point on appeal challenges the trial court's transfer of primary physical custody of J.M. and G.M. to mother. In order to succeed on motion to transfer custody, it is the movant's burden to show changes in the circumstances of the custodial parent and child since the entry of the decree, such that it would be in the child's best interest to transfer custody. *In re Marriage of Cornish,* 780 S.W.2d 62, 65 (Mo.App.E.D.1989). Removal of a child to another state without a court order may constitute changed circumstances sufficient to allow the trial court to transfer custody of a minor child. RSMo § 452.377 (1994); *Humphrey v. Humphrey,* 888 S.W.2d 342, 345 (Mo.App.E.D.1994); *see also* RSMo § 452.411 (1994). However, the transfer of custody must still be in the best interests of the child. *See Stanton v. Abbey,* 874 S.W.2d 493, 495 (Mo.App.E.D.1994). We find the

evidence supported the trial court's conclusion that the best interests of the children were served in transferring custody to mother.

Father's change of residence and removal of the children from the state without mother's consent or a court order were sufficient acts to allow the court to transfer custody. In addition to these grounds, the trial court specifically found father interfered with mother's relationship with J.M. and G.M. *See Cornell v. Cornell,* 809 S.W.2d 869, 874 (Mo.App.S.D.1991). He would question them in detail about their visits with mother, and tried to tarnish their desire to live with her by telling them that they would be in daycare and never see her. The children's wishes must also be considered, although these alone are not dispositive of the issue. *See* RSMo § 452.375.2(2) (1994); *T.C.H. v. K.M.H.,* 784 S.W.2d 281, 285 (Mo.App.E.D. 1989).

Furthermore, the deposition of Dr. Forhetz and the testimony of Dr. Hively were compelling. While in father's custody and removed from Missouri for the two years prior to the hearing, the children's emotional health has suffered. The children became shy and withdrawn, especially the youngest child, G.M. Both children suffered separation anxiety when they had to leave their mother, but did not display such a condition when leaving father. Rather, they were always happy and excited because they were going to see mother.

Father argues mother's smoking habit and her cat, which lives indoors, are detrimental to the children's allergies and G.M.'s asthma. However, mother testified she does not smoke around the children and had given it up the week prior to the trial, and, if she were to gain custody of the children, another arrangement with the cat would be worked out. Although father may have had legitimate concerns, we cannot say that, in light of the children's declining emotional health taken as a whole with the other evidence, trans-

ferring custody to mother was not in J.M.'s and G.M.'s best interests.

 For his third point on appeal, father contends the trial court erred in its calculation of child support under the Form 14 guidelines. Specifically, father argues the trial court (1) failed to consider father's obligation to his infant son, J.M.'s and G.M.'s halfbrother, as required by the guidelines; (2) failed to make a finding that the amount calculated under the guidelines was unjust and inappropriate although the court ordered him to pay other amounts of child support for uninsured medical expenses; and (3) ordered father to pay part of mother's reasonable work-related childcare costs when no evidence of these costs was presented and no finding that the amount calculated under the guidelines was unjust or inappropriate was made. We find merit in father's position.[2]

 When the amount of child support to be paid is at issue, the application of Rule 88.01 and Form 14 is mandatory. *State, Div. of Family Services v. A.J.,* 872 S.W.2d 594, 597 (Mo.App.E.D.1994). The amount calculated under the guidelines is presumed correct, although the presumption is rebuttable. *Id.* In order to deviate from the amount calculated under Form 14, the court must make a finding that such amount would be unjust or inappropriate. *Id.* In the instant case, the court did not make such a finding.

In calculating the amount of child support to be paid, the court erred in not considering father's obligation to support his son by his second wife, which is specifically addressed by Form 14. *See K.R.W. by A.C.S. v. D.B.W.,* 830 S.W.2d 38, 41 (Mo.App.W.D. 1992). This consideration directly affects the percent of the total child support obligation allocated to father. The court further erred in ordering father to pay additional amounts of child support for uninsured medical and health expenses without a finding that the award calculated under the guidelines was unjust or inappropriate. *Adelman v. Adelman,* 878 S.W.2d 871, 873 (Mo.App.E.D.

2. It appears the trial court also recognized its error. The court attempted to enter an amended order addressing these points after father filed his motion for new trial and motion to amend the judgment. However, the trial court signed

the amended order after the ninety day period, the period of time the trial court retains jurisdiction to enter such orders, had expired. Rule 78.06.

1994). Lastly, the court erred in ordering father to pay seventy percent of mother's work-related childcare costs because the percent was calculated without considering father's obligation to his son by his second wife. Thus, we reverse and remand for the trial court to recalculate the child support award under Form 14 and in compliance with its guidelines.

Father's last point on appeal contends the trial court erred in the schedule of visitation and temporary custody awarded father. Father appeals that part of the schedule providing for visitation on alternate weekends from 10:30 a.m. Saturday to 7:00 p.m. Sunday and alternate major holidays from 9:00 a.m. to 9:00 p.m., and ordering father to provide all holiday transportation. The trial court has broad discretion in ruling on visitation and custody. *Siegenthaler v. Siegenthaler,* 761 S.W.2d 262, 266 (Mo.App. E.D.1988). We will not overturn the decision of the trial court unless father has demonstrated the judgment is not in the children's best interests. *Sinopole v. Sinopole,* 871 S.W.2d 46, 48 (Mo.App.E.D.1993). We believe the evidence supports such a finding here.

Father's home in Fairfield, Iowa, is approximately two hundred miles away from the children's home with mother. This encompasses approximately three hours travel time one-way. The visitation schedule, as it pertains to holidays spent in father's custody, allows little time for the children to have valuable contact with their father. Additionally, both J.M. and G.M. had developed significant bonds with their infant halfbrother. A period of twelve hours, not considering the time spent in the car traveling, is insufficient to allow the children, father, and halfbrother meaningful holidays with one another.

The same is true of the weekend schedule of visitation. Father and children will not be in each other's company for even forty-eight hours on any weekend visit—save periods of summer visitation—again, not including the

five to six hours needed to travel back and forth. Aside from three two-week periods of custody to be exercised in the summer, father will have no extended periods of time with J.M. and G.M. The trial court did not recognize the valuable opportunities for meaningful visitation presented by J.M.'s and G.M.'s extended school breaks and the occasional three-day weekend. Furthermore, the alternating weekends will very likely interfere with the active lifestyle the children have led for the past several years.

We find this court's reasoning in *Riley v. Riley,* 904 S.W.2d 272, instructive. In *Riley,* the trial court established a "Siegenthaler Schedule" of visitation for the mother.[3] The child resided in Missouri while the mother had moved to Texas. This court found the schedule unworkable where the parties were separated by such distances. Although the distances in the instant case are not as great as those addressed by the court in *Riley,* we nonetheless believe the underlying logic applies. The travel required of the parties to exercise visitation compared to the limited time each would have to enjoy the other's company "would undoubtedly diminish the quality of any time spent together and may well engender deep resentment on the part of the child, the parent or both." *Id.* at 279.

Therefore, we reverse and remand for development of a new visitation schedule. We advise the trial court to take into consideration the distances between the parties and the time spent traveling from one parent to the other, the opportunity for visitation posed by the children's extended school breaks and three-day weekends, as well as the children's weekend activities in developing the new schedule.

With respect to father's claim that the trial court abused its discretion in ordering father to provide all holiday transportation, we disagree and affirm that part of the order.

Based on the foregoing, we reverse and remand the judgment of the trial court with

---

3. The "Siegenthaler Schedule" is a standard schedule of custody often used in decrees entered in St. Louis County derived from *Siegenthaler v. Siegenthaler,* 761 S.W.2d 262, 266 (Mo.App.E.D. 1988). It basically awards the non-custodial parent temporary custody on one night a week, on alternating weekends, and on certain holidays in alternating years. In addition, the non-custodial parent is granted three two-week periods of visitation during the summer months.

respect to the calculation of child support and the schedule of visitation, and affirm all other aspects of the judgment.

SMITH, P.J., and RHODES, J., concur.