**In the Interest of L.J.D., a minor child.**

**No. ED 96322.**

Missouri Court of Appeals,
Eastern District,
Division Five.

Nov. 15, 2011.

Lance M. McClamroch, The Law Offices of Patrick E. Richardson, P.C., Kirksville, MO, for Appellant.

Chris Koster, Attorney General, Gary L. Gardner, Assistant Attorney General, Jefferson City, MO, for Respondent.

KURT S. ODENWALD, Chief Judge.

*Introduction*

Appellant Sara Welch (Welch) appeals from the trial court's order terminating her parental rights to her minor child L.J.D. The trial court found substantial evidence to terminate Welch's parental rights under Sections 211.447.5(2) and (3), RSMo. Cum.Supp.2010 [1]. In particular, the trial court held Welch's mental retardation and depression were permanent or near-permanent mental illnesses that rendered her incapable of knowingly providing care to L.J.D.; Welch continuously failed to provide an adequate home for L.J.D.; and Welch made only minimal progress toward the goals and tasks of her two social service agreements. The trial court further found that additional services were unlikely to help Welch sufficiently improve her parental capacity, and that the termination of Welch's parental rights was in the best interest of the child. Because insufficient evidence exists to support the termination of Welch's parental rights at this time, we reverse the judgment of the trial court and remand this matter for proceedings consistent with this opinion.

*Factual and Procedural History*

L.J.D. was born to Welch and Daniel Damon on June 26, 2007. L.J.D. remained in Welch's care for the first eleven months of his life. In March 2008, a juvenile

---

1. All statutory references are to RSMo. Cum. Supp.2010 unless otherwise indicated.

officer filed a child neglect petition and removed L.J.D. from Welch's care due to the unsanitary condition of Welch and L.J.D.'s home. L.J.D. was placed under the temporary protective custody of the Missouri Department of Social Services, Children's Division (hereinafter "DSS"). In June 2008, following an evidentiary hearing, the trial court found the allegations of the child neglect petition true and placed L.J.D. in the legal custody of DSS, which placed L.J.D. in foster care. Following L.J.D.'s removal, Welch received considerable social services designed to support eventual reunification. Welch also entered into two separate social service agreements with DSS wherein she agreed to make changes and take steps to improve her parenting skills and create a safe home for L.J.D. In April 2009, DSS initiated proceedings for termination of parental rights and adoption. Damon voluntarily consented to termination of his own parental rights.

In October 2010, the Juvenile Court for Clark County held a hearing on DSS's petition to terminate Welch's parental rights. DSS presented evidence that L.J.D. suffers from severe asthma for which he receives an extensive prescription drug treatment regimen. L.J.D.'s primary physician testified that L.J.D. experiences serious asthma attacks and that, although he had never tested L.J.D.'s sensitivity to smoke, exposure to cigarette smoke could increase the frequency of attacks in some patients with asthma.

The trial court also heard testimony from Dr. Karen MacDonald, who testified regarding Welch's mental illness. Dr. MacDonald testified that she conducted a battery of tests on Welch during a single testing session. Based on the results of Welch's testing, Dr. MacDonald testified that she concluded that Welch had mild mental retardation and depression. Dr.

MacDonald further testified that these conditions could impair Welch's ability to be an effective parent.

Ms. P.J. Parker, a DSS social worker who had coordinated services for Welch and L.J.D., also testified before the trial court. Parker testified that she had conducted multiple inspections of Welch's home, originally finding it in an extraordinarily unsanitary condition. Parker testified that Welch significantly improved the cleanliness of her home, but that some of the original conditions persisted. The trial court also heard the testimony of Welch, who testified regarding the social services she had accepted and the improvements she had made toward her parenting skills and living environment in order to have custody of L.J.D returned to her.

The trial court terminated Welch's parental rights in December 2010 on grounds of abuse or neglect and failure to rectify a dangerous condition. The trial court found that Welch had mental retardation and depression which prevented her from properly caring for L.J.D., and, further, that Welch continuously failed to provide an adequately clean and safe home environment. In support of its decision to terminate Welch's parental rights for failure to rectify a dangerous condition, the trial court found that Welch failed to make progress toward the goals of her social service plans, that further social services would be futile in promoting reconciliation, and that Welch's mental illness impeded her ability to effectively parent L.J.D. The trial court also found that termination of Welch's parental rights was in L.J.D.'s best interest. Welch now appeals.

*Points on Appeal*

Welch raises six points on appeal. Welch asserts that the trial court lacked sufficient evidence to find that (1) Welch has a mental condition that is permanent,

or without likelihood that it could be reversed, that caused her to be unable to knowingly provide L.J.D. adequate care; (2) Welch continuously failed to provide an adequate home for her child's wellbeing; (3) Welch made only minimal progress toward the accomplishment of goals established in Welch's two social service agreements; (4) efforts made by DSS to aid Welch in providing an adequate home had little success, or hope of future success; (5) there was no emotional bond between Welch and L.J.D.; and (6) due to Welch's cognitive disability, it was unlikely that Welch would ever become capable of properly parenting L.J.D. even through the use of additional services.

### Standard of Review

In termination of parental rights cases, we defer to the trial court's judgment as to the credibility of witnesses and affirm the judgment unless (1) there is no substantial evidence to support the judgment, (2) the judgment is contrary to the evidence, or (3) the trial court erred in its application of the law. *In re K.A.W.*, 133 S.W.3d 1, 11 (Mo. banc 2004). Substantial evidence is "clear, cogent, and convincing evidence [that] instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *Id.* We review conflicting evidence in the light most favorable to the judgment of the trial court. *Id.*

A parent's right to raise his or her children is one of the oldest and most fundamental liberty interests guaranteed by the Constitution. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). The termination of parental rights has been characterized as tantamount to a "civil death penalty." *In re K.A.W.*, 133 S.W.3d at 12 (quotations omitted). Therefore, we closely review a trial court's findings of fact and conclusions of law and strictly construe statutes that provide for the termination of parental rights in favor of the preservation of natural parents and the parent-child relationship. *Id.*

A trial court's determination regarding whether termination of parental rights is in the best interest of the child is a subjective assessment based on the totality of the circumstances. *In re A.A.T.N.*, 181 S.W.3d 161, 171 (Mo.App. E.D.2005). Therefore, the Court uses an abuse of discretion standard to review whether termination of parental rights is in the child's best interest and does not reweigh the evidence. *See Id.*

### Discussion

Involuntary termination of parental rights may be ordered if the termination is judged to be in the best interest of the child and upon clear, cogent, and convincing evidence that (1) the parent is found to have abused or neglected the child, or (2) the child has been under juvenile court jurisdiction for one year and the court determines that the conditions that brought about the court's jurisdiction still exist, or other potentially harmful conditions currently exist. Sections 211.447.5(2), (3); *In re S.M.H.*, 160 S.W.3d 355, 362 (Mo. banc 2005). The presence of sufficient evidence to support either statutory ground is sufficient to terminate a parent's rights. *In re S.M.H.*, 160 S.W.3d at 362.

I. *The trial court erred in terminating Welch's parental rights under Sections 211.447.5(2) and 211.447.5(3)(c).*

A trial court may terminate parental rights under Section 211.447.5(2) if it finds that the parent has abused or neglected the child. Section 211.447.5(2). Before terminating parental rights under

this section, the court must make findings regarding the following four factors:

(a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;

(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or

(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development.

Section 211.447.5(2). Termination of parental rights for failure to rectify a dangerous condition under Section 211.447.5(3) also requires consideration of a mental illness factor identical to the factor described in Section 211.447.5(2)(a).

The trial court found substantial evidence to terminate Welch's parental rights due to mental illness under Sections 211.447.5(2)(a) and 211.447.5(3)(c), and further held that termination was appropriate due to Welch's failure to provide an adequate home under Section 211.447.5(2)(d).

The trial court also held that the State had not alleged, nor presented evidence, to support termination under Sections 211.447.5(2)(b) or (c).

A. *The trial court's order terminating Welch's parental rights on the basis of mental illness is not supported by sufficient evidence.*

In Welch's first point on appeal, she argues that there exists insufficient evidence to support the trial court's finding that Welch had a mental condition rendering her unable to provide necessary care for L.J.D. The trial court found that under Sections 211.447.5(2)(a) and 211.447.5(3)(c) Welch had a mental condition that was not reasonably likely to be reversed, and which rendered Welch unable to knowingly provide adequate care to L.J.D. The trial court based its finding almost entirely on the expert testimony of Dr. Karen MacDonald. Dr. MacDonald, a Doctor of Psychology, testified that she performed a clinical psychological evaluation of Welch including conducting a variety of standardized tests. Dr. MacDonald did not observe Welch with L.J.D. and never met L.J.D. Dr. MacDonald testified that the results of the tests she performed indicated Welch had mild mental retardation, depression, and low parental skills and attachment to L.J.D. Dr. MacDonald further testified that Welch's prognosis was "guarded at best" because the necessary counseling and parental skills training would require a significant long-term commitment by Welch. Dr. MacDonald testified that in her opinion Welch's depression could cause a lack of motivation which would impair the likelihood that Welch would sustain a commitment to long-term treatment. Although Welch denied that she had mild mental retardation or depression, the trial court found that "the testimony by [Welch] and the observations made by this Court during her testimony would indicate other-

wise." Based upon Dr. MacDonald's testimony and the court's own observations of Welch, the court found that Welch had a mental condition that would render her unable to provide L.J.D. necessary care and that there was no reasonable likelihood that Welch's condition would be reversed.

Welch contends that although Dr. MacDonald diagnosed Welch with depression, a diagnosis Welch disputes, Dr. MacDonald did not testify that Welch's depression was sufficiently debilitating to support the termination of her parental rights. Rather, Dr. MacDonald merely testified that Welch might lack the motivation to develop necessary parenting skills and continually provide for L.J.D.'s care. Welch argues that such testimony is insufficient as a matter of law to support a termination of parental rights under Sections 211.447.5(2)(a) and 211.447.5(3)(c). We agree.

■ Termination of parental rights under Section 211.447.5(2)(a) or (3)(c) is improper unless the trial court finds:

> A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and *which renders the parent unable* to knowingly provide the child the necessary care, custody and control."

211.447.5(2)(a), (3)(c) (emphasis added). Mental illness must be analyzed, and the trial court is required to make findings regarding: "(1) documentation—whether the condition is supported by competent evidence; (2) duration—whether the condition is permanent or such that there is no reasonable likelihood that it can be reversed; and (3) severity of effect—whether the condition is so severe as to render the parent unable to knowingly provide the child necessary care, custody, and control."

*In re K.A.W.*, 133 S.W.3d 1, 14 (Mo. banc 2004). A mere finding of even severe mental illness is insufficient. A termination of parental rights on grounds of mental illness requires substantial evidence that the incapacity is so severe that it renders the parent incapable of providing minimally acceptable care. *In re S.M.H.*, 160 S.W.3d 355, 371 (Mo. banc 2005).

■ Even a mental condition that renders a parent unable to provide adequate care for a child alone does not provide a basis for termination if the parent has access to additional support because parenting is frequently "a group effort." *In re A.S.W.*, 137 S.W.3d 448, 453 (Mo.2004). "Children are often raised with extensive help from grandparents, siblings, extended family, neighbors, day care, baby sitters, a nanny, or an array of public and private service organizations." *Id.* It is because of the frequently group nature of modern parenting that Section 211.447 does not allow for the termination of parental rights simply because a parent cannot shoulder the entire burden of raising a child on his or her own. *Id.*

In its most recent legislative session, the Missouri General Assembly reaffirmed Section 211.447's prohibition against discriminating against parents on the sole basis of disability. HB 604, enacted on July 12, 2011, amended Section 211.447.5(2), solely to add in relevant part that "[n]othing in this subdivision shall be constructed to permit discrimination on the basis of disability or disease." HB 604. HB 604 also added Section 211.447.10 which provides that "[t]he disability or disease of a parent shall not constitute a basis for a termination of parental rights without a specific showing that there is a causal relation between the disability or disease and harm to the child." HB 604.

In the same legislative session, the General Assembly enacted HB 648 and HB 555 amending Section 211.447.10 to provide that "[t]he disability or disease of a parent shall not constitute a basis *for a determination that a child is a child in need of care, for the removal of custody of a child from the parent, or* for the termination of parent rights without a specific showing that there is a causal relation between the disability or disease and harm to the child." HB 648; HB 555 (amendment emphasized). Through these amendments, the legislature has again made clear that courts must cautiously consider the termination of a parent's rights on the basis of disability and take great care to identify a causal connection between the disability and harm to a child before terminating parental rights under Section 211.447.

Our review of the record reveals no testimony or other evidence that Welch's mental illness rendered her unable to provide for the necessary care of her child. Dr. MacDonald testified that Welch has two mental impairments, mild mental retardation and depression. However, Dr. MacDonald did not testify that either condition, or any synergistic combination of both conditions, necessarily would result in permanent or near-permanent inability of Welch to provide the necessary care to her child. Dr. MacDonald testified that Welch's mild mental retardation "affects her overall function," but also testified that she has had patients with mild mental retardation who were "excellent parents." However, Dr. MacDonald noted that depression could exacerbate deficiencies in parenting skills brought about by Welch's mild mental retardation.

Important to our analysis is Dr. MacDonald's testimony that Welch's depression, and the extent to which it impaired her ability to parent, was treatable with counseling or medication. Dr. MacDonald testified that the prognosis for Welch's depression was "guarded" and not "written in stone." When questioned specifically whether Welch's mental condition rendered her unable to provide necessary care for her child, Dr. MacDonald answered that "[i]n this case, because [the child] has special needs, it would negatively impact it." Dr. MacDonald further testified on cross-examination that Welch could correct her parenting deficiencies with help.

We acknowledge that Dr. MacDonald's testimony raises concerns about the prognosis of Welch's mental illness and Welch's parenting skill, and we do not treat these concerns lightly. However, we must balance these concerns with the rights provided to Welch under our statutes. Given the totality of the Dr. McDonald's testimony, and the lack of evidence that Welch's deficiencies could not be improved with assistance and help, we hold that the concerns regarding Welch's mental retardation and depression do not rise to the level of providing substantial evidence that Welch's mental illness likely renders her permanently unable to provide adequate care to her child as is required by the newly amended Section 211.447, and more specifically, Sections 211.447.5(2)(a) and (3)(c). While Dr. MacDonald's expert opinion regarding Welch's ability to remedy her depression raises doubt as to whether Welch will be motivated to effectively treat her depression, Section 211.447 requires a determination that Welch's mental illness is either permanent, or without a reasonable likelihood that it can be reversed. Section 211.447.5(2)(a), (3)(c). Although Dr. MacDonald testified that Welch's depression would negatively impact her ability to parent her child, we hold that such testimony fails to meet the statutory requirement that Welch's illness renders her actually unable to provide adequate care.

In its analysis of Welch's mental condition under Section 211.447.5(3)(c), the trial court expressed concerns regarding Welch's ability to properly manage medication. The trial court found that Welch is unable to independently administer either her own medications, or L.J.D.'s. Upon our review of the record, we conclude that these findings are unsupported by the evidence. While Dr. MacDonald testified that Welch's medical condition would make it "difficult" for Welch to meet L.J.D's medical needs, Dr. McDonald did not testify that Welch was unable to perform these tasks. Parker, Welch's DSS social worker, testified only that Welch is often reminded by her mother to take her medication and that Welch often takes her medication in the presence of her mother. Parker did not testify that Welch was unable to independently administer L.J.D.'s asthma treatments. Welch testified that although her mother sometimes reminded her to take her medication, Welch did not actually require a reminder because she was able to remember to take her medication without help.

Moreover, the record contains substantial evidence that Welch was not only capable of treating L.J.D.'s medical needs, but that she had in fact managed his needs properly. Welch testified that she administered L.J.D.'s asthma nebulizer and took him to the emergency room if the nebulizer failed to stop one of his asthma attacks. Welch testified that she knew L.J.D.'s specific medications and described during her testimony how L.J.D.'s medications were administered, including his breathing treatments.

Given the standard of review, we must reconcile conflicting evidence in favor of the trial court's judgment. However, the standard of review also requires reversal unless the trial court's decision is supported by evidence that "instantly tilts the scales in favor of termination *when weighed against the evidence in opposition*" and leaves the fact finder with the conviction that the evidence is true. *In re K.A.W.*, 133 S.W.3d at 12 (emphasis added). Applying this standard, we weigh the testimony of Dr. MacDonald and Parker, which avers general limitations on Welch's parenting ability as well as largely unsubstantiated concerns regarding Welch's ability to administer medications, against the contrary evidence presented at trial through the cross-examination of MacDonald and Parker, as well as Welch's testimony. While we do not minimize the relevance of evidence relating to Welch's disability to the issue of Welch's parenting ability, we are unable to conclude that the evidence presented at trial establishes the requisite causal connection between Welch's disability and any harm to L.J.D. as required by Section 211.447. The record before us lacks testimony from Dr. MacDonald, or from any other source, that Welch's disability renders her actually unable to care for L.J.D. The record also lacks substantial evidence that Welch is unable to properly administer her own or L.J.D.'s medications. In light of the evidence before us, and given the requirement that all statutes providing the basis for a termination of parental rights be strictly construed in favor of preserving parental rights, we hold that insufficient evidence exists to support the trial court's termination of Welch's parental rights under Sections 211.447.5(2)(a) and 211.447.5(3)(c). Point granted.

B. *The trial court's order terminating Welch's parental rights because she continuously failed to provide an adequate home despite the financial ability to do so is not supported by sufficient evidence.*

██ In her second point on appeal, Welch argues that there exists insufficient evidence to support the trial court's find-

ing that she continuously failed to provide an adequate home for L.J.D. under Section 211.447.5(2)(d). The trial court's finding relies heavily upon the testimony of Ms. P.J. Parker. Parker is a social worker employed by DSS and has been assigned as Welch's caseworker since May 2008. Parker testified that she originally sought removal of L.J.D. after she observed dog urine and dog feces on the floor and cigarette butts and ashes throughout the home during her initial visitation of Welch's home. Parker also testified regarding Welch's failure to fill a prescription for L.J.D.'s medication. Welch testified that the unfilled medication was an antibiotic for L.J.D.'s ear infection.

The trial court found that since L.J.D.'s removal, Welch missed fourteen scheduled visits with L.J.D. because she was infested with lice or nits. The court also found that although doctors had instructed Welch to maintain a smoke-free living environment due to L.J.D.'s asthma, Parker discovered cigarette butts and a smell of smoke during her most recent visits to Welch's home. The trial court also found that Welch had failed to fill L.J.D.'s asthma prescription. Based upon its findings, the trial court held that Welch had failed to provide an adequate home to safeguard L.J.D.'s well being.

██ A termination of parental rights under Section 211.447.5(2)(d) must be based on a parent's current lack of fitness to provide adequate care for a child, not past transgressions. *In re C.W.*, 211 S.W.3d 93, 98 (Mo. banc 2007). Past acts of bad parenting are relevant only in so far as they predict future harm to a child. *Id.* "The fundamental liberty interest of natural parents in raising their children does not evaporate simply because they have not been model parents or have lost temporary custody of their children to the State." *In re K.A.W.*, 133 S.W.3d 1, 12

(Mo. banc 2004), *citing Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Without substantial evidence that a parent's current status prevents his or her ability to adequately raise a child, the parent's "fundamental liberty interest in preserving the parent-child relationship [would be] terminated on the basis of speculation instead of verifiable facts." *See In re C.W.*, 211 S.W.3d at 100.

The record before us supports a finding that the home from which L.J.D. was originally removed was unsanitary and unfit for a child. Ms. Parker testified, and the trial court found, that the original home had dog feces and urine on the floor, cigarette butts and ashes throughout the house, and was generally cluttered with debris. Even Welch testified that at the time of L.J.D.'s removal her home was unsanitary, had inadequate space for the number of people living there, and that the family smoked inside the home in the presence of L.J.D.

However, the relevant question before the trial court was whether Welch's current home was unfit to raise a child. Evidence of the current condition of Welch's home also came from Welch's caseworker, Parker, who testified that in her opinion "there is no longer any problem with [Welch's] home being dirty and below community standards with regard to cleanliness[.]" Notably, Parker did not testify that Welch's home contained any of the original unsanitary conditions. Parker did not testify that the home contained trash, clutter, or animal waste. Welch's uncontradicted testimony stated that her current home was free from cockroaches and mold, had working appliances, and was clean and well-maintained. Although Welch's home was unsanitary at the time of L.J.D.'s removal, the evidence before that trial court was that Welch had effectively cured these conditions.

Evidence was also introduced that Welch's recurring problem with lice infestation prevented her from visiting L.J.D. on numerous occasions. Both Parker and Welch testified that Welch had substantially eliminated the lice problem. Parker's social service notes also evidenced that Welch had completely resolved the lice problem in September 2008, and had no visits with L.J.D. canceled due to lice between May 2009 and February 2010. However, on October 7, 2010, a week before the hearing, Welch was found to have lice during a voluntary lice check. In response, Welch obtained and used prescription lice shampoo and eventually shaved her head in order to correct the problem before the hearing. From the record we can infer that on hearing date Welch likely did not have lice, but that lice had recently been a concern. Regardless of whether Welch herself sporadically was found to have lice, neither Parker, nor anyone else, testified to ever observing lice in Welch's home.

The most troubling finding by the trial court, and the only clear present condition of Welch's current home that might affect L.J.D.'s health, is the potential presence of cigarette smoke. The trial court found that Ms. Parker observed cigarette butts in an ashtray and smelled cigarette smoke in Welch's home during Parker's two most recent home inspections in August and September 2010. As the trial court noted, L.J.D. has severe asthma which, according to his doctors, could potentially be aggravated by cigarette smoke. However, L.J.D.'s physician only testified that, generally, asthma can be made worse by cigarette smoke. The record does not contain any expert testimony or medical evidence that L.J.D.'s asthma is in fact made worse by smoke.

DSS does not provide, nor have we found, any case where a Missouri court has terminated parental rights based upon a parent's refusal to comply with a doctor's orders related to a child's non-life-threatening medical condition. In fact, in *McElroy v. McElroy,* 910 S.W.2d 798, 804 (Mo. App. E.D.1995), we awarded custody of children with asthma and allergies to their mother despite evidence that the mother smoked cigarettes and owned a cat that lived indoors. *Id.* We held that even though these presented legitimate concerns, they were not sufficient in and of themselves to provide a basis to deny custody. *Id.*

However, a failure to follow a child's doctor's orders may still be a factor in termination of parental rights cases. In *In re E.D.H.,* We held that a father's parental rights could be terminated on grounds of abandonment or neglect when, in part, he allowed individuals to smoke around his asthmatic child. *In re E.D.H.,* 138 S.W.3d 761, 765 (Mo.App. E.D.2004). In that case the father agreed not to smoke, or allow others to smoke around the child. *Id.* Despite the child's asthma, the father admitted to allowing others to smoke in a car with the child, and DFS had to terminate the child's home visits because the child complained of people smoking around her. *Id.* We note that our decision in that case was not based solely on a finding that the father had permitted smoking around an asthmatic child. Rather, we held that termination was justified because, in addition, the father had not attempted to visit or correspond with the child, pay child support, and had failed to attend the majority of doctor's appointments and social service meetings. *Id.* at 764–65.

The record is devoid of evidence that Welch has presently exposed L.J.D. to cigarette smoke. Parker testified that she observed evidence of cigarette smoking in Welch's home during her most recent

home visits in August and September of 2010. However, L.J.D. was removed from Welch's custody in 2008. Therefore, the evidence before the trial court suggested only that smoking may have taken place in a home L.J.D. had not occupied for over two years. No evidence was presented that Welch or her family currently, or even recently, smokes near L.J.D. Welch testified that neither she, nor her parents smokes in her current home.

Although we are troubled by evidence that smoking might begin or continue in Welch's home and that L.J.D. might thereby be exposed to smoke if physical custody of L.J.D. were returned to Welch, this risk is speculative. While we do not treat lightly the general evidence that the health of persons suffering from asthma could be adversely effected by the presence of second hand cigarette smoke, the record before us contains no evidence from any medical expert or from L.J.D.'s physician that L.J.D. had ever suffered from an asthma attack due to second hand smoke or that his asthma was adversely effected by his presence in his mother's home. Moreover, Dr. Yager, L.J.D.'s physician, testified that L.J.D. continued to have the same severe asthma problems while in two separate foster homes. Dr. Yager testified that L.J.D. would continue to struggle with asthma no matter where he lived. Dr. Yager's testimony is corroborated by Parker who testified that L.J.D. continued to have significant problems with his asthma during both of his foster placements after he was removed from Welch's custody.

We note that our decision might be different if the record contained evidence that Welch and her family's smoking presented a significant health risk to L.J.D. See D.D.C. by Juvenile Officer v. B.C., 817 S.W.2d 940, 943 (Mo.App. W.D.1991) (terminating mother's parental rights, in part, because mother consistently refused to follow doctor's dietary recommendation which caused children to become chronically malnourished, underdeveloped, and fail to thrive.). Although, Dr. Yager testified that, in his opinion, the best environment for L.J.D. would be in a smoke-free home, Dr. Yager admitted that he did not conduct the necessary tests to be able to testify to the scope of L.J.D.'s sensitivity to smoke. Dr. Yager testified that smoke inflames L.J.D.'s lungs making his asthma worse. But, Dr. Yager also testified that he had not conducted the necessary tests to determine whether smoke on clothing could aggravate L.J.D.'s asthma. The record supports only a finding that Welch and her family may have had smoke on their clothing when they interacted with L.J.D. during the last several years, not a finding that they currently smoke in L.J.D.'s presence. Therefore, the risk described by Dr. Yager is not applicable here.

The trial court's finding that L.J.D. was removed after Welch failed to fill his asthma prescription is also without support. While evidence was presented at trial that Parker found an unfilled prescription for L.J.D. during her initial home inspection, Parker did not identify the type of medication that was not filled. Welch, however, testified at trial without contradiction, that the medication at issue was for L.J.D.'s ear infection. We note that DSS does not refute that the trial court's finding was a misstatement of the evidence. This distinction is significant because, although a failure to fill any prescription is troubling, failing to fill L.J.D.'s asthma medication would have presented a different and substantially more life-threatening risk. Operating under this mistake, the trial court overemphasized the risk Welch's error presented to L.J.D.

After reviewing the record, and after deferring to the trial court on the credibili-

ty of witnesses and having reconciled conflicting evidence in the light most favorable to the judgment of the trial court, we nevertheless find the evidence before the trial court does not "instantly tilt the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *See In re K.A.W.*, 133 S.W.3d 1, 12–13 (Mo. banc 2004). Although L.J.D does not currently live with Welch, her home should still reflect the level of care and cleanliness that would eventually allow for the return of L.J.D.'s custody. *See Id.* at 18. However, the evidence before the trial court suggests that Welch has met this threshold, with the possible exception of the presence of smoke inside the home. But no evidence was presented that L.J.D. has a strong enough sensitivity to smoke that the presence of past smoking inside the home would trigger an asthmatic reaction. Dr. Yager specifically testified that he had not conducted the tests necessary to either confirm, or refute, a finding that L.J.D. had a sensitivity to the remnants of past smoking. Dr. Yager testified only that it was hypothetically possible that being in an environment where smoking had occurred could trigger an asthma attack in an individual with extreme sensitivity to smoke. Dr. Yager did not testify that L.J.D. had any such sensitivity to smoke. Given the absence of any medical testimony to would support a finding that L.J.D. had such an extreme sensitivity to smoke, the evidence before the trial court was insufficient to terminate Welch's parental rights on grounds of *abuse or neglect.*

Therefore, we hold the evidence before the trial court was insufficient to justify termination of Welch's parental rights under Section 211.447.5(2)(d) as substantial evidence of current abuse of neglect. Point granted.

II. *The trial court erred in terminating Welch's parental rights under Section 211.447.5(3).*

In Welch's third and fourth points on appeal, Welch argues that there is insufficient evidence as a matter of law to terminate her parental rights under Section 211.447.5(3) for what is commonly referred to as "failure to rectify." *See In re S.M.H.*, 170 S.W.3d 524, 531 (Mo.App. E.D.2005). Parental rights may be terminated under Section 211.447.5(3) if the trial court finds that the child has been under the jurisdiction of the juvenile court for at least a year and the conditions that led to the assumption of jurisdiction exist or potentially harmful conditions currently exist, there is little likelihood the conditions will be remedied, or continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. Section 211.447.5(3). Under this statutory provision, the trial court is required to consider and make specific findings regarding:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control.

Section 211.447.5(3)(a)–(d). The factors do not constitute separate grounds for termination in and of themselves, but are categories to be considered with all other relevant evidence. *In re B.L.H.*, 158 S.W.3d 269, 278 (Mo.App. E.D.2005).

The trial court did not make a separate finding that a dangerous condition existed or that the conditions which originally justified its jurisdiction continued. However, the trial court did find that "[t]he circumstances that existed at the time of removal continue to exist" in the context of analyzing whether there was any likely benefit to providing Welch with additional support under Section 211.447.7(4). Given this finding, we proceed with our analysis inferring that the trial court found a dangerous condition existed, and that the evidence presented respecting subsections (a) or (b) [2] instantly tipped the scales in favor of termination when weighed against contrary evidence, and that the court was left with the abiding conviction that the evidence was true so as to terminate Welch's parental rights. *See K.A.W.*, 133 S.W.3d 1, 11–12 (Mo. banc 2004). In other words, the trial court found that Welch's failure to accomplish the goals of her social service agreement either constituted a potentially dangerous condition or failed to remedy a potentially dangerous condition, or that Welch's failure to improve her parenting skills after receiving counseling services created or failed to rectify a dangerous condition. For the reasons stated below, we disagree.

A. *The trial court erred in finding Welch made only minimal progress toward the achievement of the goals of her social service agreements.*

Social service plans provide highly relevant evidence to the trial court. *In re S.M.H.*, 160 S.W.3d 355, 368 (Mo. banc 2005). The extent to which a parent has made an effort to accomplish the plan's goals indicates the parent's future efforts to care for the child. *Id.* Conversely, a parent's lack of effort to comply with the plan, or effort without success, can help predict future problems. *Id.* But a parent is not required to completely satisfy all aspects of a social service plan to avoid termination. *Id.* Failure to comply with one or more parts of a social service plan does not constitute automatic grounds for termination of parental rights. *Id.* at 368–69. Rather, accomplishing the goals of a service plan is but one factor for the trial court to consider. *Id.* at 369. Therefore, the issue in termination of parental rights cases is whether progress has been made toward the plan goals, not whether there has been full or substantial compliance. *Id.* Even then, a failure to achieve progress toward social service plan goals only supports termination of parental rights when a dangerous condition is left uncorrected as a result. Section 211.447.5(3).

Welch argues that she has substantially complied with all, or nearly all of the goals of each of her service plans. Welch contends her success in achieving the goals evidences her commitment to successful parenting and renders the trial court's de-

---

**2.** The trial court's rationale could presumably also have been based on a finding that a dangerous condition exists as a result of mental illness under Section 211.447.5(3)(c). But, having found *supra* that these grounds are without sufficient evidence, we confine our analysis here to subsections (a) and (b). Subsection (d) has no application to this appeal.

cision incapable of substantial evidentiary support. DSS argues that although Welch has technically complied with the terms of the agreements, her compliance with the agreement's goals is "hypertechnical" and "assumes that superficial compliance demonstrates accomplishment of the underlying purpose" of the social service agreement. DSS also contends that this Court should affirm the trial court's decision even if we find that Welch successfully accomplished the goals set by both service agreements because the factors presented by Section 211.447.5(3)(a)–(d) are superfluous in that the trial court is still permitted to terminate parental rights under 211.447.5(3) if there is substantial evidence of the continued presence of a dangerous condition. We find both of DSS's arguments unpersuasive.

1. *First Social Service Agreement.*

Welch entered the first of two social services agreements on September 18, 2008. The record shows that the First Agreement contained three goals, all of which were fully or substantially completed at the time of the trial. The first goal stated that Welch will live with her parents and that their home will be above minimal community standards of cleanliness. Welch lived with her parents both at the time the First Agreement ended and at the time of the trial. As noted above, Parker testified that the Welchs' home was above minimal community standards of cleanliness.

The First Agreement's second goal is that Welch will maintain her health by regularly visiting her doctor, taking her medication, and "working with Regional Center." Although the trial court found that Welch is unable to independently take her medication, Welch testified that she regularly visits her doctor and Parker and Welch both testified that Welch takes her medication.

The First Agreement's third goal is that Welch would visit L.J.D. twice per week. Welch attended over one hundred visitations with L.J.D. Parker testified that Welch never failed to arrive for a scheduled visit with L.J.D., although Welch was denied visitation on several occasions due to the presence of lice. After reviewing the record before us, we are unable to conclude that substantial evidence exists to support a finding that Welch failed to make progress toward, or failed to substantially complete the goals of her First Social Service Agreement.

2. *Second Social Service Agreement.*

Welch entered into the Second Social Service Agreement on January 27, 2009. The Second Agreement's first goal is to maintain a safe home environment. Within this goal were four tasks, the first of which required Welch to properly store trash, have clean dishes, and store clothing properly. Welch presented evidence at trial that she completed this task, evidence which DSS did not refute. The second task of the first goal is that Welch would remain free of lice and remove roaches from her home. The record makes clear that while Welch has had less success in achieving these tasks, she has made substantial efforts toward their accomplishment. The evidence shows that Welch used prescription shampoo to remove lice and nits, fumigated her home, and even shaved her head completely. Evidence introduced through Parker's testimony during cross-examination showed that Welch had successfully eliminated lice and roaches at various times during Parker's supervision. The record before us suggests that at the time of the trial Welch had invested considerable effort into accomplishing these tasks and attained some success. The third task of the first goal stated that Welch would provide adequate space for L.J.D. and herself. Welch testified that

she currently resides with her parents and brother in a four bedroom house that included a toddler bed for L.J.D. Parker testified, and the trial court found, that Welch's sister and her sister's boyfriend also lived in the home. Deferring to the trial court's finding still leaves each adult or adult couple with their own bedroom, allowing L.J.D. to stay in a bedroom with Welch. We do not find this housing arrangement uncommon among large or mixed-generation families or a failure of Welch to meet this aspect of the first goal. The fourth and final task of the first goal, that Welch will maintain a smoke-free home, is more troubling, because the evidence presented suggests this task may not have been achieved.

The second goal of the Second Agreement is that Welch maintain her own health. Like the First Agreement, this goal consisted of various tasks including Welch taking her medication as prescribed, having her medication levels tested, and following the recommendations of her doctor. Both the testimony of Welch and Parker confirm that Welch met this goal. The trial court, however, held that the goal was not accomplished because Welch often took her medication at the request of her mother. We hold the trial court's finding is against the weight of the evidence. While the trial court minimizes Welch's accomplishment because her mother's assistance, the task as set forth in the written social service plan has been met. The record clearly shows that Welch was required to take her medication properly and that she has done. While we may have concerns that Welch relies upon assistance from her mother to accomplish this goal, the service plan as agreed to by Welch and DSS does not preclude such assistance. Our concerns do not detract from the fact that Welch successfully accomplished this specific task of taking her

medication as set forth by DSS in the service plan.

The third goal of the Second Agreement is that Welch be attentive to L.J.D.'s needs. The tasks included within this goal required Welch to call L.J.D. twice weekly when he was sick and spoke weekly to Thelma Martin regarding L.J.D.'s health. Parker and Welch testified that Welch regularly called Children's Division to check on L.J.D.'s health. The trial court made no specific finding related to his goal.

The final goal of the Second Agreement required Welch to interact with L.J.D. during visits. The tasks included within this goal required that Welch arrive for scheduled visits with L.J.D., have a lice check prior to visits, and leave her coat in the lobby of Children's Division during visits. The trial court found that Welch often only passively interacted with L.J.D. during her two hour visits and missed several visits due to the presence of lice. The trial court further found that Welch was unable to demonstrate proper parenting skills during scheduled visits, despite having attended parenting training sessions and individual counseling. The trial court's findings are responsive to the substance of the overriding goal that Welch effectively interacted with L.J.D. Nevertheless, we cannot overlook the effort put forward by Welch and the success she achieved in meeting the stated tasks within the final goal of the Second Agreement. Welch never failed to attend any of the over one hundred scheduled visits with L.J.D. Welch typically brought L.J.D. snacks and toys during her visits and spent much of the time playing with L.J.D. Welch brought L.J.D. Halloween costumes, and Christmas and birthday presents at every holiday. It is certainly possible that DSS would have preferred to see Welch more actively engaged during visits.

But, based on the record before us, we do not find that Welch failed to interact with L.J.D. as was required by the Second Agreement.

After thoroughly reviewing the entire record, including all of the goals and tasks of both social service agreements, we cannot conclude that Welch made only minimal progress toward the completion of the service agreements or that she failed to substantially accomplish the goals of both agreements. Although we agree with the trial court that Welch failed to fully accomplish some of the benchmarks set through the agreements, the standard before this Court is whether progress has been made toward the goals, not whether complete success has been achieved. *In re S.M.H.,* 160 S.W.3d 355, 368 (Mo. banc 2005). Even after reconciling conflicting evidence in the light most favorable to the judgment, the evidence presented satisfies this standard. *See In re K.A.W.,* 133 S.W.3d 1, 11–12 (Mo. banc 2004).

We further note that even if Welch had not made sufficient progress towards the goals set forth in the social service agreements, the trial court made no finding regarding a specific dangerous condition. While the trial court is statutorily required to make specific findings on each factor of Section 211.447.5(3), these findings are not a substitute for an articulated finding of the presence of a dangerous condition. Here, the record on appeal suggests that the Welch's home is above minimal standards of cleanliness, she understands how to safely administer medication, and that Welch has made progress toward her social service agreement goals. While the trial court's findings cast doubt as to whether Welch is a highly capable parent, such findings fall short of the requirement that the trial court identify a dangerous condition before ordering the termination of parental rights under Section 211.447.5(3). We cannot overlook this omission in light of the requirement that statutes providing for the involuntary termination of parental rights be strictly construed in favor of the preservation of the natural parent's rights. Point granted.

B. *Trial court's finding that further services are unlikely to be beneficial.*

In her fourth point on appeal, Welch contends that the trial court erred in finding under Section 211.447.5(3)(b) that DSS's services were not successful in helping Welch adjust her circumstances to provide a proper home for L.J.D. This point on appeal is moot because we have already held that the trial court erred in finding that Welch failed to remedy a harmful condition, and the trial court's finding that DSS's services were not successful does not provide a separate ground for the termination of Welch's parental rights under Section 211.447.5(3).

The trial court follows a two-step process when termination of parental rights is alleged under Section 211.447(3). First, the trial court must determine whether the conditions that originally justified the court's jurisdiction exist, or new potentially dangerous conditions presently exist. Section 211.447.5(3). Second, the trial court is required to consider and to make specific findings under each of the four subsections. Section 211.447.5(3). The subsections "do not constitute separate grounds for termination in and of themselves, but rather are categories of evidence to be considered with all other relevant evidence." *In re B.L.H.,* 158 S.W.3d 269, 278 (Mo.App. E.D.2005). In other words, the subsections provide an organizational framework through which the trial court examines much of the evidence in order to determine whether the parent has failed to remedy a condition, and whether that failure is likely to continue.

Section 211.447.5(3)(b) requires the trial court to determine whether past services have been successful in helping a parent remedy a harmful condition. Section 211.447.5(3)(b). The success or failure of the services already given functions as a proxy for determining the likely merit of future services. However, regardless of the trial court's findings under the subsection, termination of parental rights is authorized under Section 211.447.5(3) only if the trial court first finds a harmful condition that has not been remedied. This conclusion is clear as a matter of plain meaning statutory construction because Section 211.447.5(3) states: "[i]n determining whether to terminate parental rights *under this subdivision,* the court shall consider and make findings [on each subsection]." Section 211.447.5(3) (emphasis added). But also as a matter of logic, if no harmful condition presently exists, either the DSS services were successful in remedying the condition, the condition was remedied without DSS services having aided in the condition's remedy, or there was never any harmful condition in the first place for the DSS services to have helped remedy. Any of these three conclusions defeats a petition for the termination of parental rights under Section 211.447.5(3).

The same two-step process that trial courts use to determine the merit of termination of parental rights under Section 211.447.5(3) also applies to our appellate review of the trial court's judgment. If we find that the trial court incorrectly found that a parent failed to remedy a harmful condition, the trial court's findings regarding the subsections cannot justify upholding a termination of parental rights under Section 211.447.5(3). *See In re B.L.H.,* 158 S.W.3d at 278. Because we previously found the trial court's decision to terminate Welch's parental rights for failure to remedy a harmful condition under Section 211.447.5(3) was without substantial evidence, the trial court's findings under subsection (b) is moot.

### III. *Trial court's finding that termination of Welch's parental rights is in the best interest of child.*

In her fifth and sixth points on appeal, Welch argues that the trial court erred in finding that there was no parent-child bond and that Welch's cognitive impairment prevented additional services from remedying her parenting deficiencies under Section 211.447.7. Section 211.447.7 requires that the court make specific findings related to the best interest of the child if the court has previously found a statutory basis for the termination of parental rights. Section 211.447.7. The trial court found that Welch made an effort to maintain regular visits, Welch had financially contributed to L.J.D.'s care, and "is certainly interested in the welfare of her child." However, the trial court also found that there was no emotional bond between Welch and L.J.D. and that providing future services to Welch was likely to be futile toward returning L.J.D. to her custody.

Both points of appeal relate to the trial court's finding that termination of Welch's parental rights was in the best interest of the child. However, we may reach the issue of the trial court's finding on the best interest of the child only if we have already held that one or more statutory grounds for the termination of parental rights exists. *In re S.M.H.,* 170 S.W.3d 524, 534–35 (Mo.App. E.D.2005). Having already held that the trial court's decision to terminate Welch's parental rights under Sections 211.447.5(2) and (3) was without substantial evidence, we need not reach Welch's final issues on appeal.

Although we decline to reach this issue, we do note that, in contradiction to the

trial court's finding that "[n]o evidence was presented for this Court to find that there is an emotion tie" between Welch and L.J.D., the record contains substantial evidence that L.J.D. is bonded to Welch. While Parker did testify on direct examination that L.J.D was not bonded to Welch, Parker provided significant contradictory testimony on cross-examination. During cross-examination Parker admitted that L.J.D. enjoys spending time with Welch, L.J.D.'s face "lights up" when he sees her, and that he throws temper tantrums when his visitation time with Welch is over and he is forced to leave her. Parker also testified that L.J.D. calls Welch "Mom" and that Welch has never failed to bring L.J.D. gifts at a holiday or on his birthday.

Welch also testified that L.J.D. was bonded to her. Welch testified that when she arrived for visits L.J.D. would typically see her coming and run to the door and jump up and down. Welch also testified that during visitations L.J.D. would tell other people not to pick him up because he did not want to let Welch go, or that he wanted to leave with Welch. After reviewing the record, we find that there is ample evidence that L.J.D. has an emotional bond to Welch.

### Conclusion

While we share the trial court's concerns regarding the ability of Welch to provide a safe home for L.J.D. and whether Welch's parenting skills will offer L.J.D. the best opportunities in the future, we cannot disregard the substantial evidence of Welch's compliance with the social service programs and the lack of evidence that her mental conditions render Welch unable to provide L.J.D. with the necessary care, custody and control to which he is entitled. Our holdings today do not return custody of L.J.D to Welch. Nor do we remove L.J.D. from the oversight of DSS, or reduce DSS's role in determining when, if ever, Welch should be allowed unsupervised visitation, or be entitled to have custody of L.J.D. be returned to her. DSS continues to have oversight and the opportunity to seek termination of Welch's parental rights in the future should Welch fail to continue her progress toward the removal of lice, fail to preserve or restore her home to an environment compatible with L.J.D.'s asthma, or fail to maintain adequate overall cleanliness of her home. Although Welch does not currently have custody of L.J.D., her home should reflect the level of care, cleanliness, and freedom from smoke that would allow the eventual return of L.J.D. to that home. However, after reviewing the record before us, and given the undisputed progress Welch has made, we are unable to conclude that substantial evidence exists to support the trial court's decision to terminate Welch's parental rights at this time under Sections 211.447.5(2) and (3).

Therefore, we reverse the judgment of the trial court terminating Welch's parental rights and remand for further proceedings consistent with this opinion.

GLENN A. NORTON, J., and BEN BURKEMPER, Sp. J., Concur.

