In the Interest of: I.G.P., Plaintiff,

K.D.P. (Mother), Appellant,

v.

Juvenile Officer, Respondent,

Missouri Children's Division,
Respondent.

No. WD 74598.

Missouri Court of Appeals,
Western District.

June 12, 2012.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 31, 2012.

Application for Transfer Denied
Sept. 25, 2012.

Danieal Howard Miller and Michael Blum, Columbia, MO, for Appellant.

Christena Lynn Nelson, Hallsville, MO, for Plaintiff.

Teri Lynn Armistead, Columbia, MO, for Respondent Juvenile Officer.

Ellen Kay Haynes, Jefferson City, MO, for Respondent Children's Division.

Division Three: THOMAS H. NEWTON, P.J., JAMES M. SMART, JR., and GARY D. WITT, JJ.

JAMES M. SMART, JR., Judge.

K.D.P. ("Mother") appeals the circuit court's judgment terminating her parental rights to I.G.P. ("Child") under section 211.447.5. Mother contends that there was insufficient evidence to support a finding that would justify termination, and contends the evidence did not support a finding that it is in Child's best interest to terminate Mother's parental rights. We affirm the judgment of the trial court.

### Statement of Facts

I.G.P. ("Child") was born on June 2, 2005, in Boone County, Missouri, to K.D.P. ("Mother") and A.M.H. ("Father"). Father's parental rights to Child were termi-nated on July 28, 2011. A petition for termination of parental rights of the mother was filed on March 15, 2011, and after a hearing on the matter, taking place over the course of several days, the trial court entered its sixty-three page Final Judgment terminating Mother's parental rights on November 4, 2011. Mother appeals the court's judgment terminating her parental rights.

Prior to Child's birth, Mother received services through the Children's Division, as Child's siblings were removed from Mother and placed in Children's Division's custody. In February 2003 and January 2004, Child's siblings were found to be in need of care and treatment due to abuse and neglect and the Children's Division provided services to Mother to address her history of substance abuse, mental illness, and domestic violence between Mother and Father. Throughout the siblings' cases, Mother continued to abuse alcohol and marijuana, was discharged from substance abuse treatment because of noncompliance, failed to address her mental health issues, and failed to progress toward reunification. On July 30, 2004, Mother's parental rights to Child's siblings were voluntarily termi-nated.

Due to Mother's history, a Family Centered Services Case was opened upon Child's birth, June 2, 2005, to provide Mother with intensive in-home services. On November 30, 2006, a call was made to the Children's Division hotline regarding Child because of a lack of supervision and unsafe shelter, listing Mother as the perpetrator. The Children's Division and law enforcement responded to the home and found that Mother had attempted to commit suicide. Mother admitted that while she was caring for Child and three of her friend's children, she drank alcohol, ingested Tylenol with codeine, and cut her-

self. The children were found covered in Mother's blood and sitting on the glass that Mother used to cut herself. Child was taken into protective custody on November 30, 2006, by order of the court, based on a finding that there was probable cause to believe that: Child's siblings had (previously) been abused or neglected by both Mother and Father; the parental rights of Mother and Father to Child's siblings had been terminated; Mother and Father suffered from mental conditions which rendered them unable to knowingly provide Child with necessary care, custody, and control; Mother and Father suffered from chemical dependency; Mother attempted suicide while caring for Child and was receiving inpatient psychiatric care; and Mother and Father had failed to follow the recommendations of the Children's Division during the open Family Centered Services case.

On January 8, 2007, Child was found to be within the jurisdiction of the court pursuant to section 211.031.1(1), RSMo, and was made a ward of the court in the custody and supervision of the Children's Division for appropriate placement. Mother was ordered to abide by the Children's Division's treatment plan which recommended Mother participate in counseling to address past abuse, self-esteem, and social network issues; become active in the community through volunteer work; complete a drug and alcohol assessment through the McCambridge Center; continue to see Dr. Joseph Parks for psychiatric care; find suitable daycare for Child; and maintain a budget. On January 23, 2007, Child was placed with Mother on a trial home placement. The Children's Division continued to provide Mother with extensive services to address her substance abuse and mental health issues.

In February of 2007, Mother participated in a substance abuse assessment through the McCambridge Center and it was recommended that Mother participate in outpatient substance abuse treatment. After several positive urinalysis screenings for marijuana, the treatment provider at McCambridge recommended that Mother participate in inpatient services. From February 27, 2007 to March 16, 2007, Mother participated in, and successfully completed, inpatient treatment at McCambridge. Upon discharge, it was recommended that Mother continue to participate in outpatient services and follow up with psychiatric treatment with Dr. Parks. After Mother's discharge from inpatient substance abuse treatment, McCambridge continued to provide outpatient services for Mother. However, due to Mother's continued drug use and positive urinalysis screenings, it was recommended that Mother participate in an inpatient substance abuse treatment program again before continuing with outpatient services.

On June 21, 2007, Mother began inpatient substance abuse treatment at Hannibal Council on Drugs and Alcohol, and on July 20, 2007, Mother was discharged from the program as provisionally successful. Upon discharge from Hannibal, the treatment provider recommended that Mother participate in outpatient substance abuse treatment and participate in individual therapy.

From January 2007 to July 2007, while Child was on trial home placement with Mother, she relapsed on three different occasions, continued to use marijuana and alcohol, continued to struggle with her mental health issues of depression, anxiety, and post-traumatic stress disorder ("PTSD"), her home continued to be in disarray, and Child was observed to be "unkempt," with delayed language skills.

In September 2007, because of continued concerns for Mother's substance abuse and mental health issues, she was referred

to Daybreak Treatment Center and was ordered by the court to successfully complete treatment through the dual diagnosis program. On October 5, 2007, Mother was assessed at Daybreak and it was recommended that she participate in inpatient residential treatment. Mother refused inpatient treatment, but agreed to participate in outpatient substance abuse treatment. While in outpatient services, Mother continued to deteriorate psychiatrically. Her adaptive functioning diminished, and she continued to use substances, resulting in recommendation for residential treatment. Mother finally agreed to inpatient treatment, and continued to participate in outpatient services through Daybreak until funding for inpatient services could be approved. Mother participated in individual therapy with Greg Boyt while at Daybreak.

From January 2007 to November 2007, Mother was sporadic in her attendance and participation with substance abuse treatment and mental health services. During this time, Mother continued to test positive for marijuana and to use alcohol to deal with stress, she expressed feelings of depression and being overwhelmed, indicated she was not able to consistently care for Child and placed Child at Rainbow House. On November 30, 2007, the Children's Division requested that Child be removed from Mother's home, and on December 3, 2007, Child was taken into protective custody.

On December 17, 2007, Child was continued as a ward of the court in the custody and supervision of the Children's Division for appropriate placement. Mother was ordered to successfully complete inpatient treatment through Daybreak, to participate in psychiatric treatment and take all medications as prescribed, to participate in services through "Parents as Teachers," to have visitation as arranged by Children's Division, to abide by Children's Division treatment plan, and to undergo drug testing as requested by Children's Division.

On April 28, 2008, Mother began participation at Daybreak. However, on June 28, 2008, Mother was unsuccessfully discharged. Mother left the facility against staff advice. The following day, Mother contacted the treatment provider at Daybreak and asked about returning to the program. Her speech was slurred and she admitted that she had been drinking alcohol. The treatment provider recommended that she participate in a "detox" program before returning to the program and offered to assist her in setting up that service, but Mother declined. Mother never attempted to reengage in services through Daybreak.

On July 10, 2008, Mother was admitted to Mid–Missouri Mental Health Hospital for an attempted suicide, by cutting her wrists, and on July 25, 2008, she was discharged to the Southeast Missouri Community Treatment Center in Salem, Missouri. Mother participated in inpatient substance abuse treatment and on August 28, 2008, she was successfully discharged from the program. Shortly after her discharge, Mother began participating in outpatient substance abuse and mental health treatment through New Horizons. From the time Mother began services through New Horizons until approximately October 2009, Mother also participated in individual therapy.

Although Mother was participating in some services to address her substance abuse and mental health issues, she failed to progress beyond supervised visitation with Child. As of March 2009, Child was placed on a trial home placement with Father. In April 2009, Mother relapsed and began using alcohol and marijuana to cope with her mental health issues. In

May 2009, Mother attempted suicide again and was hospitalized. (She drank alcohol and cut herself, cutting an artery requiring surgery.) From approximately July 2009 to October 2009, Mother failed to participate in any substance abuse treatment or individual therapy.

On October 21, 2009, Child was removed from Father's home and taken into protective custody due to Father using illegal substances and violating the safety plan developed by the Children's Division by allowing Child to have unsupervised contact with Mother. At the time of Child's removal from Father's home, Mother indicated that Child had been living with her for approximately four months without Children's Division's approval. The Children's Division Case Manager had contact during that period of time with Child's daycare, and the daycare reported that the Child's vocabulary regressed, her peer interactions deteriorated, and she demonstrated a tendency to throw temper tantrums when she did not get her way.

Child was placed back in foster care, and the Children's Division continued to work toward reunification with Mother. The Division recommended that Mother participate in substance abuse treatment and individual therapy again. From November 2009 to August 2010, Mother was not consistent in participating in individual therapy or substance abuse treatment. During this same period, Mother failed to maintain sobriety and continued to ingest alcohol and marijuana. In November 2009, Mother drank alcohol and was sexually assaulted. In March 2010, Mother drank alcohol and fell and broke her leg. In March 2010, Mother was hospitalized

for a suicide attempt after she drank alcohol and overdosed on medications.

Since approximately April 2009, when Mother relapsed, until the time of trial, Mother failed to participate in any substance abuse treatment program and continues to use alcohol and marijuana. In September 2010, Mother did reengage in individual therapy. A referral was made to Terri Hoskins at the Family Health Center, and Hoskins began seeing Mother in October 2010. From November 2010 to the time of trial, about a year later, Mother attended therapy intermittently. While Mother failed to attend psychiatric appointments after August 2010, the psychiatrist continued to prescribe Mother medication for her depression. Throughout the case, Mother has consistently been diagnosed with PTSD, depression, and borderline personality disorder, and has continued to use marijuana and alcohol.

The Petition for Termination of Parental Rights of Mother was filed on March 15, 2011. The trial court heard evidence on August 24th–26th, and September 1st–2nd, 2011. The trial court entered its judgment terminating Mother's parental rights on November 4, 2011, finding that termination was in the best interests of Child. Mother appeals.

### Discussion

### I. Motion for Leave to Correct Judgment Nunc Pro Tunc

We must first address Respondent's Motion for Leave to Correct Judgment *Nunc Pro Tunc*, which was taken with the case. Respondent Juvenile Officer requests, pursuant to Supreme Court Rule 74.06(a),[1] that this court amend the judgment of the trial court to reflect the

---

1. Rule 74.06(a) states: "Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an

correct statute number for termination. Respondent contends that the judgment includes a clerical error arising from oversight, in that the Findings of Fact are based on the findings necessitated by section 211.447.5(3), while the Conclusions of Law and Judgment to terminate Mother's parental rights reflects the incorrect statutory subsection number of section 211.447.5(1). Respondent concedes that the trial court made no findings that the juvenile was abandoned or that the juvenile had been abused or neglected as a basis to terminate Mother's parental rights, even though the trial court specifically cited in its conclusions of law that "statutory conditions exist for said termination of parental rights pursuant to Section 211.447.5(1)."

After reviewing the judgment of the trial court, we find that the clear intention of the trial court was to terminate Mother's parental rights pursuant to section 211.447.5(3), *not* subsection (1). Not only was the petition filed by the juvenile officer based solely upon section 211.447.5(3), but the *fifty-five pages* of Findings of Facts espoused by the trial court in its judgment were specifically tailored to meet the requirements of subsection (3). Therefore, we find the statement in the Conclusions of Law section that the termination was based on subsection (1) to be a clerical error, and Respondent's motion for leave is granted. Paragraph one (1) of the Conclusions of Law section of the trial court's judgment shall be amended to reflect the fact that termination of Mother's parental rights was based on section 211.447.5(3) instead of subsection (1).

## II. Insufficient evidence for termination of Mother's rights under Section 211.447.5

In Mother's first point relied on, she argues that the court erred in terminating her parental rights because there was insufficient evidence, as a matter of law, to support a finding of at least one ground in section 211.447.5 to justify termination. Because the trial court's findings were based solely on section 211.447.5(3), *see supra* section I, we need only evaluate whether competent evidence existed that Child had been under the jurisdiction of the court for at least one year and the conditions that led to jurisdiction still existed or potentially harmful conditions still existed.

### Standard of Review

▮▮▮ We defer to the trial court's judgment as to the credibility of witnesses and affirm the judgment of termination of parental rights "unless (1) there is no substantial evidence to support the judgment, (2) the judgment is contrary to the evidence, or (3) the trial court erred in its application of the law." *In re L.J.D.*, 352 S.W.3d 658, 662 (Mo.App.2011). "Substantial evidence is 'clear, cogent, and convincing evidence [that] instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true.'" *Id.* (quoting *In re K.A. W.*, 133 S.W.3d 1, 11 (Mo. banc 2004)). All conflicting evidence is viewed in the light most favorable to the judgment of the trial court. *Id.*

### Analysis

▮▮▮ Involuntary termination of parental rights pursuant to section 211.447.5(3), for failure to rectify, may be ordered if it is judged upon "clear, cogent and convincing evidence" that: (1) the child has been under the jurisdiction of the

appeal, such mistakes may be so corrected with leave of the appellate court."

juvenile court for at least a year; (2) that the conditions that led to the assumption of jurisdiction persist or potentially harmful conditions currently exist; and (3) that there is little likelihood the conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. § 211.447.5(3); *see In re L.J.D.*, 352 S.W.3d at 662. In addition, the trial court *must* make appropriate findings as instructed in subsection (3)(a-d) of section 211.447.5:

> (a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
>
> (b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
>
> (c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
>
> (d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control. . . .

It is undisputed that Child has been under the jurisdiction of the juvenile court for a period of longer than one year. The trial court entered specific findings, in accordance with section 211.447.5(3)(a–d), finding that the harmful conditions leading to the court's jurisdiction still exist and that there is little likelihood those conditions will be remedied in the near future so that Child can be returned to Mother in the near future, and that continuation of the child-parent relationship greatly diminishes Child's prospects for early integration into a stable and permanent home. Mother contends the court erred in entering these findings.

## A. Terms of the Social Service Plan

 Social service plans provide highly relevant evidence to the trial court, as the extent to which a parent has made an effort to accomplish the plan's goals indicates the parent's future efforts to care for the child. *In re S.M.H.*, 160 S.W.3d 355, 368 (Mo. banc 2005). A parent's lack of effort to comply with the plan, or effort without success, can help predict future problems. *Id.* Mother admits that she "has not completely adhered to all of the provisions of the various written service agreements with the Division," but argues that complete satisfaction is not what is required. Mother is correct that the issue in termination of parental rights cases is whether *progress* has been made toward the plan goals, not whether there has been full or substantial compliance. *See id.* at 369. Failure to comply with parts of the service plan is not grounds for automatic termination; it is only one factor the trial court considers in making its decision. *Id.* at 368–69. However, failure to achieve progress towards the terms of a social service plan supports "termination of parental rights when a dangerous condition is left uncorrected as a result." *In re L.J.D.*, 352 S.W.3d at 671.

 The trial court found that Mother failed to progress in complying with the terms of the social service plan entered into by Mother and the Children's Division

including: the fact that she failed to consistently attend and follow through with individual therapy and substance abuse treatment; failed to adequately address her mental health condition and substance abuse issues; failed to progress beyond supervised visitation from April 2010 to the time of trial; and failed to otherwise abide by the Children's Division's case plan. Significant evidence was adduced that Mother, from approximately 2006 to the time of trial, demonstrated sporadic participation in services and failed to adequately address the issues that brought Child into Division care, including her mental health condition and substance abuse issues.

From November 30, 2006, until the time of trial, the Children's Division recommended that Mother attend individual counseling to address various issues: stability, child development, addiction issues, sobriety, the death of her adoptive mother, family support, Mother's childhood trauma, anxiety, phobias, budgeting, self-esteem, and mental-health needs until successfully discharged; that Mother attend all mental-health appointments and take all medications as prescribed until successfully discharged by the psychiatrist; that Mother participate in substance abuse treatment and follow all recommendations of the treatment provider until successfully discharged; that Mother participate in AA/NA meetings and maintain sobriety; that Mother participate in random urinalysis screenings; and that Mother participate in visitation.

Mother was not consistent in participating in individual therapy and has failed to successfully work through issues of past trauma, her diagnosis of PTSD, and other mental health needs. In January 2007, Mother participated in individual therapy, in conjunction with substance abuse treatment, with Robin McCartney through the McCambridge Center. Due to Mother's continued use of substances and the facility having exhausted services for her, individual therapy was discontinued and a referral was made for her to participate in another treatment program. From July 2007 to August 2007, Mother reengaged in individual therapy with McCartney after completing an inpatient treatment program. Mother struggled with attendance, sobriety, and her ability to cope with her emotional issues without using substances.

In October 2007, Mother began therapy with Greg Boyt through Daybreak Residential Treatment Center. She attended only ten of her sixteen scheduled appointments and failed to progress in meeting established therapy goals due to her continued substance use. Boyt testified that Mother's continued substance abuse of alcohol and marijuana impacted her ability to process cognitive material presented, was indicative of her lack of motivation and commitment to the process, and resulted in her deterioration psychiatrically, as well as diminished adaptive functioning. In April 2008, Mother reengaged in individual therapy with Boyt; however, in June 2008 she left treatment against staff advice and discontinued individual therapy.

From July 2008 to October 2009, Mother participated in individual therapy with Isaiah Cummings through New Horizons. Cummings testified that Mother failed to adequately address her diagnosis of PTSD, as she continued to struggle with setting appropriate boundaries, had conflicts with significant others, and engaged in unhealthy relationships. During this time, Mother continued to abuse alcohol and marijuana as the primary coping strategy to deal with stress and anxiety. From November 2009 to August 2010, Mother engaged in individual therapy with Greg Allen. She agreed to weekly therapy sessions, but attended only ten sessions in a ten-month

period. From October 2010 to June 2010, Mother began individual therapy with Terri Hoskins. Hoskins testified that Mother attended only eleven of her twenty-nine appointments. Hoskins further testified, and the trial court found, that Mother failed to adequately address her symptoms of PTSD, failed to adequately address her negative thoughts that lead to escalated emotions, failed to make sustained progress, failed to resolve issues with her boyfriend, failed to refrain from marijuana and alcohol use, and failed to learn to manage symptoms of anxiety in more adaptive ways. Furthermore, at the time of trial, Mother testified that she was not participating in any form of individual therapy.

While Mother contends that "[a]ll of [her current and past treatment providers] indicated that she was making slow and steady progress," this statement misconstrues the larger context of the collective testimony during the hearing that the progress being made by Mother was in very few areas, and limited. She cites only two passages of testimony to support this assertion: one from Terri Hoskins, one of Mother's therapists, and one from her psychiatrist, Joseph Parks.

Hoskins testified that Mother's progress in achieving sustainability has been "slow and gradual," and that while she had made progress in some areas, she had not made progress in stopping her use of marijuana or resolving her relationship with her boyfriend, who "pos[es] a significant risk factor" for Mother's ability to keep "unsafe people" out of her home. Furthermore, Hoskins testified that Mother, who has a permanent and persistent borderline personality disorder, is not meeting the factors needed to care for a child with the disorder.

A: ... people with borderline personality disorder can parent children.

They can become more stable, but it would depend on numerous factors.

Q: And what are those factors?

A: Level of commitment to treatment and self-care, support systems available, lack of unsafe people in the home.

Q: At this point, has [Mother] been showing a level of commitment in her treatment?

A: I think [Mother] has a desire to get better, and she's worked hard to get better. She *has not* demonstrated a level of commitment in terms of keeping her therapy appointments or keeping her appointments with her psychiatrist.

Q: And does she have an adequate support system?

A: I'm not aware of an adequate support system for her.

Q: Has she been able to keep unsafe people out of her home?

A: Well, I would consider [her boyfriend] as posing a significant risk factor in that regard, and he is still in the home.

(Emphasis added.)

Hoskins also testified that Mother's lack of follow through with the social service plan is cause for concern.

Q: What type of support would [Mother] need to sustain any kind of long term success and stability?

A: She would need to attend counseling *consistently*. She would need to stay on her medication *consistently*. She would need to stay away from emotionally unsafe people who victimize her or abuse her in some way. She needs to feel better about herself and have stronger sense of self-esteem, and she needs supportive services that can help her with managing stress and parenting and a variety of other daily issues.

. . . .

Q: Based on her history, do you see her being successful in her treatment in the reasonable, foreseeable future?

A: Well, based on her history, I have concerns because she has had over four years to complete this—complete the [Division] requirements, and it's been very difficult for her, despite really wanting to do that.

(Emphasis added.) Hoskins' testimony is far from finding that Mother's progress was "steady" or successful.

Parks testified that Mother has made progress toward dealing with her PTSD, even going as far as to state, "[s]he's much better than she used to be." However, Parks concluded that Mother still suffers from recurrent depressions and ongoing symptoms of PTSD. Parks testified that Mother's ability to function is greatly impacted by her PTSD. Parks concluded Mother suffers from marijuana dependence and uses it as a way to cope with her PTSD and anxiety. Furthermore, Mother's participation in psychiatric services during the time he was treating her, 1999–2010, was only "intermittently consistent." Sometimes Parks would go months without seeing Mother, and other times she would show up weekly or a couple of times a month for a while, demonstrating a lack of commitment to addressing her mental issues. Parks' testimony regarding the mild progress of Mother in addressing her PTSD issues also sheds light on the fact that Mother was not progressing in other areas, and in some cases she was actually regressing, contrary to her blanket statement that all of her care providers testified that she was making "slow and steady progress."

In addition, Mother was not in compliance with the social service plan, because she was supposed to supply the Division with documentation of attending meetings for her various substance abuse and mental health issues, but regularly failed to do so, or did not turn in any verification of attendance at all.

As a part of the recommended program for Mother set forth by the Division, she was also to enroll and participate in the program "Parents as Teachers." Mother left that program and never reinitiated with the director of the program afterward. Mother was therefore not in compliance with that goal of her recommended plan.

From November 30, 2006, to the time of trial, the court found, and testimony supported, that Mother failed to consistently take her medications as prescribed. On April 23, 2010, she overdosed on Klonopin. Since the time of the overdose, Mother's medication has been controlled by her New Horizons Case Manager to ensure that she is taking all of her medications.

The trial court also found that despite participating in numerous substance abuse treatment programs, Mother failed to follow the recommendations for aftercare services, has failed to complete further substance abuse treatment programs offered and has been unsuccessful in maintaining sobriety. Mother failed to consistently attend her AA/NA meetings and indicated it was due to increased anxiety in a group setting.

Mother also failed to consistently submit to random urinalysis drug screenings. She did not attend approximately twenty-five urinalysis screenings out of approximately forty-five requested. Of the drug screenings she attended, she tested positive approximately thirteen times for marijuana, and continually indicated the failure to submit to the screenings was because she knew she would test positive for marijuana.

From April 2010 to the time of trial, Mother also failed to progress beyond su-

pervised visitation with Child. From March 22, 2011 to July 11, 2011, Mother participated in the supervised visitation grant program, designed to teach her appropriate discipline, parenting skills, and age-appropriate behaviors. The therapist working with her testified that she lacked confidence in her parenting abilities, needed support when addressing Child, was involved in an unhealthy relationship (which she described as verbally abusive), was unable to consistently follow through with consequences when parenting Child, would "give in" to Child's demands, and that Mother's boyfriend was easily frustrated with Child. In July 2011, the therapist recommended that Mother continue in supervised visitation due to her concerns.

█ The trial court found, and clear, cogent, and convincing evidence supports the finding, that Mother failed to progress in complying with the terms of the social service plan set by the Division. The inability to follow through or make progress in meeting the terms of the plan is indicative of Mother's current and future inability to care for Child, and continuing visitations with Mother place Child at risk of harm due to Mother's inability to address her mental health and substance abuse issues. There was ample witness testimony to support the court's findings and conclusions that Mother did not comply, or even progress in complying, with the terms of the social service plan she entered into with the Children's Division. More importantly, Mother's inability to address her substance abuse and mental health issues, including her continued use of alcohol and marijuana, and seemingly consistent inability to control the urges to abuse those drugs throughout the terms of her service plan, have left a "dangerous condition" uncorrected.

## B. Success or Failure of Children's Division's Services

█ Section 211.447.5(3)(b) requires the trial court to determine whether past services were successful in helping a parent remedy a harmful condition. *In re L.J.D.*, 352 S.W.3d at 675. The trial court found that the Children's Division was unsuccessful in aiding Mother in adjusting her circumstances or conduct in order to return Child to her home based on the numerous services offered to Mother over a period of five years. The Children's Division has continually offered Mother many services since November of 2006, including: in-home services, family-centered services, dual-diagnosis residential treatment, inpatient substance abuse treatment, outpatient substance abuse treatment, individual therapy, medication management, the "Parents as Teachers" program, weekly visitation, supervised visitation, transportation to visits, AA/NA meetings, random drug testing, psychological evaluation, and parenting assessments. Even with the services offered, Mother has failed to adequately address her PTSD and other mental health issues, has continued her use of drugs (including regular use of marijuana and alcohol), has failed to follow the recommendations of her psychological plan, and has failed to abide by the Children's Division's treatment plan, including failing to submit to random urinalysis drug screenings.

Mother contends that whatever problems she still has today are the result of the Children's Division's inability, financial or otherwise, to deal with her PTSD and depression when it failed to protect Mother when she was a child in the system. She claims she cannot "fix" her problem because she is not receiving the proper psychological treatment she needs. The Children's Division has provided Mother with ample and continuing support

throughout the time period Child has been in the court's jurisdiction. As discussed previously, Mother has consistently failed to take advantage of that support and the available treatment options for addressing her mental and substance abuse issues. For example, Mother testified that she could not attend her therapy sessions because she could not afford the $2.00 (round-trip) bus fare, every other week, for a total cost of $4.00 per month. However, she testified that she had continually spent approximately $80.00 per month on marijuana from January 2007 to the time of trial.

Child was initially removed from Mother's home due to Mother's history of mental health and substance abuse issues, history of abuse and/or neglect of her other children, an attempted suicide in the presence of Child, and failure to follow recommendations of the Children's Division. After a failed trial home placement, Child was again removed from Mother's custody due to Mother's mental health and substance abuse issues, as well as her inability to provide care for Child. The trial court found that the Children's Division offered services to address Mother's mental health and substance abuse issues and her inability to parent Child, but from the time Child came into her care until the time of trial, Mother failed to adequately address her mental health and substance abuse issues, was still in an abusive and unhealthy relationship, and did not have the support necessary to manage stress or to parent Child. Furthermore, Mother's inability to assess situations in terms of safety created an unsafe living environment for Child and affected her ability to parent. This was supported by the evidence adduced at trial.

■■■ The trial court further found that there is little likelihood that the conditions will be remedied at an early date so that the juvenile can return to the mother in the near future. The court's finding was supported by the testimony of the multiple therapists who had worked with Mother and indicated she had failed to progress in meeting therapy goals, the testimony of Dr. Duncan–Hively who indicated that Mother was still in need of longterm residential treatment to address her mental health and substance abuse issues, and by Mother, who indicated that she was not participating in any mental health or substance abuse treatment at the time of trial and had no real intention of doing so unless she was required by the court.

## C. Mental Condition

■■■ Mother argues the trial court's finding that Mother's mental condition is either permanent or has no reasonable likelihood of being reversed and renders her unable to provide Child with the necessary care was against the weight of the evidence. We disagree. "Weight of the evidence" means its weight in probative value, not the quantity or amount of evidence. *In re K.K.*, 224 S.W.3d 139, 149 (Mo.App.2007). Weight of the evidence is not determined by mathematics, but depends on its effect in inducing belief. *Id.* "We exercise extreme caution in considering whether a judgment should be set aside on the ground that it is against the weight of the evidence, and will do so only upon a firm belief that the judgment was wrong." *Id.* (internal quotations omitted).

■■■ Here, Mother challenges the court's finding regarding her mental health issues as being against the weight of the evidence, but fails to set forth a viable against-the-weight-of-evidence argument. as she merely sets forth selective evidence contrary to the trial court's finding while ignoring favorable evidence and the trial court's credibility determinations. *See Houston v. Crider*, 317 S.W.3d 178, 187 (Mo.App.2010) (an against-the-weight-

of-the-evidence argument requires completion of four sequential steps: (1) identify a challenged factual proposition; (2) identify all of the favorable evidence supporting the proposition; (3) identify evidence contrary to that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations; and (4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition). Nevertheless, we note that a review of the record as a whole reveals that grounds for termination of Mother's parental rights has been proven by clear, cogent, and convincing evidence, and Mother's contention that her mental condition is not permanent and does not render her unable to provide for Child is without merit.

■ Termination of parental rights under section 211.447.5(3)(c) is improper unless the trial court finds:

A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control.

The trial court must analyze the mental illness and make specific findings regarding: "(1) documentation—whether the condition is supported by competent evidence; (2) duration—whether the condition is permanent or such that there is no reasonable likelihood that it can be reversed; and (3) severity of effect—whether the condition is so severe as to render the parent unable to knowingly provide the child necessary care, custody, and control." *In re K.A. W.,* 133 S.W.3d at 14. "A termination of parental rights on grounds of mental illness requires substantial evidence that the inca-

pacity is so severe that it renders the parent incapable of providing minimally acceptable care." *In re L.J.D.,* 352 S.W.3d at 664 (citing *In re S.M.H.,* 160 S.W.3d at 371).

There was uncontroverted evidence, supported by admissions of Mother, that she has an extensive history of mental illness, dating back to her childhood abuse. Mother has received multiple diagnoses from multiple providers, and has consistently been diagnosed with PTSD, major depression, borderline personality disorder, polysubstance abuse, cannabis dependence, and alcohol dependence. None of this is disputed. Many of the conditions Mother has been diagnosed with, including PTSD and borderline personality disorder, are treatable to a certain extent, but are *permanent and persistent.* To be treated, however, a consistent commitment to an appropriate therapy program is required. The evidence adduced at trial clearly indicated that Mother was anything but consistent in her mental health and substance abuse treatments, and that her future success was questionable due to her lack of commitment to fulfilling the conditions of four years of treatment plans.

■ Mother contends that while she may have mental illnesses, the illnesses do not render her unable to provide Child necessary care, custody, and control, and that the trial court erred in making such a finding. She has been hospitalized repeatedly due to her mental illness and has a history of self-medication, noncompliance with medication management, psychiatric care and counseling, and approximately ten suicide attempts, including an attempt while caring for Child, which resulted in the juvenile being removed from the home. The Juvenile Officer's witnesses documented Mother's history of minimal progress in her overall functioning due to her mental illnesses. While one therapist testified

that Mother had made some progress because she had made no further attempts to harm herself since 2010, that same therapist testified that she was very concerned with Mother having any success in her treatment of her other illnesses in the foreseeable future, due to her history of non-commitment to treatment.

At her last counseling session in June 2011, Mother continued to exhibit symptoms consistent with PTSD and borderline personality disorder, including: severe anxiety, hypervigilance, feelings of guilt and shame, low self-esteem, an inability to regulate emotions, marked instability in mood, fear of abandonment, continuation of unhealthy relationships, and altered thinking and behavior. The trial court found that the symptoms of Mother's diagnoses leave her feeling tense, irritable and on edge, she has difficulty concentrating, worries obsessively, feels panicked in large groups, and it affects her ability to care for herself on a daily basis, as well as to provide proper care, custody and control for Child. The trial court further found that Mother's diagnosis of PTSD causes her to engage in a pattern of choosing unstable partners and tolerating dysfunction, which creates an unsafe environment for Child. Mother testified that her relationship with Child's father was very unhealthy and involved physical violence. She further testified that her current relationship with her boyfriend is detrimental, because when they argue, she gets scared she is going to have a stroke and gets extremely stressed about everything and gets "the palpitations." This relationship has also resulted in verbal and physical altercations, involving law enforcement, on at least three occasions and as recently as June 2011.

Hoskins, Mother's therapist from October 2010 to June 2011, indicated Mother's progress had been very slow and gradual over four years. Duncan–Hively, clinical psychologist, testified that Mother needed long-term residential treatment to address her mental health needs and substance abuse treatment of a duration of twelve months or longer, in which Mother would need to form a therapeutic relationship and form a level of trust with the treatment provider, and only then would she be able to work through her PTSD issues, assuming she was committed to treatment. Mother testified that she did not want to participate in long-term treatment, had not arranged for treatment even though she has the funds to do so, and would not participate in long-term treatment unless ordered to do so by the court.

█ "A judgment terminating parental rights must be based upon more than past conditions." *In re C. W.*, 211 S.W.3d 93, 98 (Mo. banc 2007), *overruled in part on other grounds by Interest of B.H.*, 348 S.W.3d 770, 777 (Mo. banc 2011). "Past behavior can support grounds for termination [of parental rights], but only if it is convincingly linked to predicted future behavior," as "[t]here must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm." *In re K.A.W.*, 133 S.W.3d at 9–10. Given Mother's history of inconsistent participation in treatment, self-medication and diagnosis of mental illness, the lack of progress in addressing her mental-health condition, considered in conjunction with her current symptoms of mental illness and refusal to comply with recommended treatment modalities, the trial court correctly ascertained that her mental illness is permanent, cannot be treated in a reasonable time, and is likely to cause harm to Child in the future. Mother's argument that the termination of her parental rights was based solely on her disability is misguided and fails to take into account the substantial evidence as to

Mother's current mental health symptoms, which have caused harm and create the potential for harm to Child.

### D. Chemical Dependency

 Section 211.447.5(3)(d) provides for the termination of parental rights based on a parent's "[c]hemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide care, custody and control."

While Mother's argument tries to paint a picture that she only smokes marijuana and such use does not impact Child, that argument ignores the evidence before the court. Mother testified that she began using illegal substances at the age of sixteen and had already been using alcohol since age six, with heavy use of alcohol since age twelve. She has consistently abused marijuana and alcohol since approximately 2001 and has been diagnosed with polysubstance abuse, cannabis dependence, and alcohol dependence. Mother admits that she has failed to maintain sobriety during the time periods when she has participated in inpatient and outpatient substance abuse treatment. Mother's abuse of substances led to the abuse and neglect of her other two children, resulting in her losing parental rights to those children, as she used illegal substances and alcohol during pregnancy and engaged in domestic violence in the children's presence.

Mother's continued use of alcohol has led to impaired judgment, unsafe decision making, and altercations with her boyfriend in the recent past, which has left her in an unsafe place physically and emotionally, which she herself admits. In the past, Mother's alcohol abuse has led to her: leaving Child unattended and unable to be located while at a party, blacking out, being abused by men, falling and breaking her leg, and attempting suicide while caring for Child. Mother testified that she is totally incapable of providing care for her child when under the influence of alcohol. Prior to the August 2011 hearing, in June 2011, while ingesting alcohol, Mother engaged in an altercation with her boyfriend and law enforcement had to be contacted. Mother testified that she last drank in late July 2011 or early August 2011 and was very sick for two days, very depressed, and could not get out of bed. During her testimony on September 2, 2011, Mother testified that she had even used marijuana the previous evening and that during the trial, she had used marijuana daily, sometimes twice daily on the weekend, and was not trying to quit using marijuana.

Mother's use of alcohol and marijuana is directly linked to her mental health issues. Mother testified that she used alcohol at times when she was feeling depressed and overwhelmed. While under the influence of alcohol, Mother is unable to make appropriate decisions, which places her in risky situations and leads to further victimization. The record reflects multiple examples of her re-victimization leading to exacerbation of her mental health issues, suicide attempts, and relapse.

Mother also testified that she ingests marijuana to control her symptoms of anxiety and depression. Mother's therapist Boyt, an expert in the field, testified that Mother's continued use of marijuana exacerbates her anxiety, increasing the risk of harm to herself and Child.

The record supports that Mother's ability to provide care or control necessary for Child's physical, mental, and emotional health is intrinsically linked to her own instability and that her continuing abuse of marijuana and alcohol, and refusal to get treatment, prevents her from consistently

providing the necessary care, custody and control over Child.

### Conclusion

The court's findings under section 211.447.5(3)(a–d) are consistent with the evidence and testimony adduced at trial. We find no error in the trial court's termination under 211.447.5(3), as Child had been under the court's jurisdiction for over one year and the evidence shows no likelihood that the conditions leading to Child being removed from Mother's care (substance abuse, mental illness issues, and failure to comply with the Children Division's service plan) will be remedied so that Child can be returned to Mother in the near future. Furthermore, continuation of the child-parent relationship greatly diminishes Child's prospects for early integration into a stable and permanent home, which Mother cannot provide. Mother continues to engage in unhealthy relationships and substance abuse; these behaviors contribute to Mother's lack of an ability to provide a stable home for Child. We find no error. Point I is denied.

### III. Termination was in Best Interest of the Child

#### Standard of Review

"A trial court's determination regarding whether termination of parental rights is in the best interest of the child is a subjective assessment based on the totality of the circumstances." *In re L.J.D.*, 352 S.W.3d at 662. Therefore, we use an abuse of discretion standard to review whether termination of parental rights is in the child's best interest and do not reweigh the evidence. *Id.*

#### Analysis

The trial court found clear, cogent, and convincing evidence to support termination of Mother's parental rights for failure to rectify under section 211.447.5(3). Once a statutory ground supporting termination of parental rights is found, the trial court must determine, by a preponderance of the evidence, whether termination is in the best interest of the child. *In re M.L.R.*, 249 S.W.3d 864, 869 (Mo.App. 2008). The trial court found that termination of Mother's rights was in Child's best interests and entered findings on all appropriate and applicable factors under section 211.447.7(1–7) in reaching its decision.

Importantly, the trial court found that despite Child's emotional ties to Mother, continuation of the parent-child relationship greatly diminished Child's prospects for early integration into a stable and permanent home. At the time of trial, Child had been in out-of-home placement for approximately three years and eight months; over half of her life. The record supports the existence of mutual love between Mother and Child; however, it also shows that Mother is unable to provide a stable and safe environment for Child and a continuation of Mother and Child relationship would be detrimental to Child.

From approximately March 2010 to the time of trial, Child participated in counseling with Sarah Gray to address symptoms which included tantrums, bossiness, poor coping skills, nightmares, a lack of social skills, and defiance toward authority. Child was diagnosed with chronic PTSD, expressive language disorder, and physical abuse and neglect (victim). The diagnosis of PTSD is based in part on the events leading to the removal of Child from Mother and Child having witnessed Father physically abusing Mother.

Gray testified that Child's behaviors indicated a need for "a lot of stability and structure" and consistent discipline. Gray further stated that Child required firm expectations and consequences. As out-

lined above, throughout the supervised visitation program, Mother lacked the ability to set firm limits and expectations for Child, failed to provide adequate structure for Child, and lacked confidence in her ability to appropriately parent. Evidence was also presented that Child had an atypical relationship with Mother, as she had taken on a "caretaker role" of Mother. When speaking of Mother, Child indicated she was worried about her and viewed her mother as "fragile." Gray also testified that she had offered to begin therapeutic visitations between Child and Mother, but Mother never contacted her to set up an appointment. Gray was adamant that Child needed "immediate permanency," as Child continues to feel that she is in transition, which disrupts her ability to form attachments and to feel secure. Because of this need for permanency, Gray stated that she believed termination of Mother's parental rights was in the Child's best interest due to the length of time Child had been in foster care and the Child's immediate need for permanency.

The Court Appointed Special Advocate ("Advocate") assigned in the underlying juvenile case in January 2009, testified that she had visited with Child approximately forty-five times in various places, including the foster home, the daycare, and Father's home. The Advocate indicated that when Child was supposed to be on trial home placement with Father during the summer of 2009, Child was actually living, and having unsupervised visits, with Mother. From approximately July 2009 to October 2009, Child's speech regressed, she clung to others, she was aggressive and yelled at other children, and during one occasion after being dropped off at daycare by her father, she began screaming, crying, and throwing a fit that her daddy was not going to come back to get her. Mother confirmed that Child was residing with her during this time period.

Child's regression was linked to being in Mother's "care." The Advocate stated that Child commented that she returned home to Mother in order to protect Mother and fight the bad guys, and that her mother needs her. The Advocate testified that she believed terminating Mother's parental rights was in Child's best interest, because Mother has failed to resolve her mental health and substance abuse issues, and Mother has shown no signs of progressing toward meeting with a therapist and remedying these issues.

The Guardian Ad Litem, appointed to Child's case in 2009, testified that she did not believe that termination of Mother's parental rights was in Child's best interests, because Child is bonded with Mother and Mother now has access to financial resources she did not previously have. The GAL, however, indicated that she had met with Child only *one time* since 2009 and had failed to file any motions on behalf of Child, although she disagreed with the visitation plan and felt that increased visitation was in the Child's best interest. Furthermore, the record shows that while Mother may have funds for additional services at this time, Mother has a history of failing to follow through with services offered, and cannot meet Child's need for "immediate permanency." In addition, the GAL's testimony fails to address the safety and environmental concerns for Child, should Child witness another relapse or suicide attempt, incident of domestic violence while living in Mother's home, and/or a lack of care if Mother abuses drugs again.

The trial court found, and evidence supported, that additional services were not likely to bring about a lasting parental adjustment enabling a return of Child to Mother within an ascertainable period of time. As outlined above, the record reveals that Mother was provided numerous

services to appropriately address her mental health and substance abuse issues, but did not participate fully in, or take advantage of, such services. Mother failed to consistently attend individual therapy sessions. Mother failed to participate in many of the offered services, and she was not willing to participate in residential treatment in October 2007 when it was recommended. When she finally did agree to inpatient services in April 2008, she discharged herself against staff recommendations and never reengaged in treatment. Mother's assertion that she can make a lasting parental adjustment enabling the return of Child within an ascertainable period of time is not supported by any evidence—especially considering that the evidence supports that Mother has failed to make any real progress or adjustment in the last five years, and she testified that she had not set up any counseling and was not willing to participate in longterm residential treatment unless ordered to do so.

The court further found that Mother's inability to adequately address her substance abuse and mental health issues, as well as her unwillingness to participate in a long-term residential substance abuse treatment program, demonstrated a lack of commitment to herself and to Child, and subjected Child to a substantial risk of physical and mental harm if the relationship continued.

There were sufficient findings to support the best interest determination made by the trial court, and the evidence overwhelmingly supports the trial court's decision that it was in Child's best interest to terminate Mother's parental rights. There was no abuse of discretion. Point II is denied.

### Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed in all respects, except that the clerical mistake in the judgment reciting the incorrect statutory subsection is corrected to refer to 211.447.5(3). Rule 84.14.

All concur.