

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF T.J.P., Jr. | ) | |
| | ) | |
| JUVENILE OFFICER, | ) | |
| | ) | |
| Respondent, | ) | WD76551 |
| | ) | |
| v. | ) | OPINION FILED: |
| | ) | March 4, 2014 |
| | ) | |
| T.L. (Mother), | ) | |
| | ) | |
| Appellant. | ) | |

### Appeal from the Circuit Court of Jackson County, Missouri
### The Honorable Justine E. Del Muro, Judge

**Before Division One:** Cynthia L. Martin, Presiding Judge, and
Mark D. Pfeiffer and Karen King Mitchell, Judges

T.L. (Mother) appeals the trial court's order terminating her parental rights to her minor child (Child).[1] Mother argues that the trial court failed to make certain required findings, that the findings the trial court did make were legally insufficient and not supported by the evidence, and that the evidence does not support a finding that termination was in Child's best interests. Finding no error, we affirm.

---

[1] The trial court also terminated the parental rights of Child's father. Child's father has not appealed the termination.

**Factual and Procedural Background**[2]

Child was born to Mother and T.P. (Father) on May 20, 2011. Mother and Father never married and were no longer in a romantic relationship as of the date of the trial.[3] Mother has two other children with her ex-husband, a daughter (Sister) born in March 2005, and a son (Brother) born in November 2007. Sister lives with Mother's ex-husband in Lee's Summit, Missouri. Although Mother was awarded joint legal and physical custody of Sister, she testified that she had not seen her daughter since August 2012 due to a lack of transportation. Brother lived with Mother from his birth until March 2009 when he was removed from her care after being diagnosed with failure to thrive.[4] In ordering Brother's removal from Mother's care, the court found that Brother "was below the third percentile of recommended growth for a child of his age" and Mother had "refused to follow the physician's recommendations for an increased feeding schedule." The court found that Brother required a medication schedule for asthma, Mother failed to administer the asthma medication, and Brother's eczema had been left untreated causing lesions on his face. Brother was later placed in the care of Mother's father and stepmother in Illinois. In September 2011, with Mother's consent, Mother's father and stepmother were appointed legal guardians of Brother. Mother testified that she has not seen Brother since he was first placed with her father and stepmother in Illinois in the summer of 2010 because she cannot afford to visit and does not have her own transportation.

---

[2] "We view the facts and all reasonable inferences therefrom in the light most favorable to the trial court's judgment terminating parental rights." *In re C.S.*, 351 S.W.3d 264, 269 (Mo. App. W.D. 2011).

[3] It is clear from the record that Mother and Father had a tumultuous relationship, and both Mother and Father testified that they were no longer romantically involved at the time of trial. The social worker who saw Mother and Father regularly for couples counseling testified that their relationship had "pulled apart" in the six months leading up to the trial. However, the record also reflects that Mother and Father still saw each other frequently, Father often provided transportation for Mother, and they spent time together socially.

[4] Mother was divorced in 2006 and, although Brother was born after the divorce, court records indicate that Mother's ex-husband is Brother's biological father.

On May 23, 2011, the Juvenile Officer filed a petition alleging that Child was in need of care and treatment due to Mother's neglect of Brother and Sister. The petition also alleged that Mother "has been diagnosed with Bipolar Disorder and Antisocial Personality Disorder but fails or refuses to take prescribed medication or comply with regular therapeutic treatment." Child was taken into custody by the Division of Family Services (Division) and placed in foster care, where he remained as of the date of trial. Initially, the permanency goal for Child was reunification, but, in April 2012, the goal was changed to termination of parental rights and adoption. A Petition for Termination of Parental Rights was filed on August 16, 2012, and a trial was held on March 11-12, 2013. Since at least July 2012, Child has been in a foster home where adoption is possible.

Between July 2011 and June 2012, Mother entered into three service agreements with the Division. The agreements included the following goals: obtain a GED and employment; remain compliant with mental health services; remain medication compliant; improve parent/child interactions; and participate in all court-ordered services. The court ordered Mother to complete a psychological evaluation with a parenting assessment and follow all recommendations; participate in individual therapy; and participate in parenting classes. The court also ordered couples counseling and a parent aide to be provided.

Mother was twenty-eight years old at the time of trial and she had struggled with mental illness since childhood. Mother participated in two psychological evaluations, the first in May 2009, after Brother was removed from her care, and the second in July 2011. In May 2009, Mother reported that she was diagnosed with bipolar disorder and possible schizophrenia at the age of twenty-four. The doctor who performed the 2009 evaluation diagnosed Mother with

3

bipolar disorder, manic, severe with psychotic features; relational problem NOS (not otherwise specified); neglect of child; and antisocial personality disorder.

Dr. Gregory Sisk evaluated Mother in July 2011, after Child was removed from her care. At trial, Dr. Sisk noted that Mother had a history of mental health services dating back to when she was ten years old. Mother told Dr. Sisk about receiving mental health treatment when she was ten, seventeen, nineteen, and twenty-four years old. Dr. Sisk's written report noted that Mother sought treatment for her mental illness when she was nineteen years old because she "'had so much going on [she] was starting to lose slots in [her] memory. [S]he was going to therapy to try to keep [her] sanity and memory.'" Dr. Sisk compared Mother's condition in 2011 to the results of her May 2009 evaluation, and ultimately, diagnosed her with neglect of children by history (based on her past involvement with the Division); bipolar disorder, mixed type (a person with both manic and depressive episodes) with psychotic features; and mixed personality disorder (a person with signs of both antisocial and borderline personality disorders).

Mother's history also reflects noncompliance with prescribed medication. It appears that Mother was prescribed Seroquel at some point in 2008, which she took until April 2009 when she went to jail on child endangerment charges.[5] Later, possibly while she was in jail, Mother was prescribed lithium, which she took until the prescription ran out. Mother testified that she ran out of all prescribed medication shortly before discovering she was pregnant. At that time, she did not refill her prescription nor did she take any medication during her pregnancy.[6]

---

[5] Mother was in jail from April 25, 2009, until the week before her May 2009 evaluation, after being charged with child endangerment of Brother. The charges were ultimately dropped.

[6] The evidence surrounding Mother's decision to stop taking medication around the time of her pregnancy is conflicting. Mother testified that she ran out of medication two weeks before discovering she was pregnant (a discovery she appears to have made in October or November 2010), and she testified further that, after discovering she was pregnant with Child, she consulted Dr. Syed Jaffri at Comprehensive Mental Health Services (CMHS) and was told that she was not "allowed to take the medications that [she] was on." However, although Mother started individual therapy sessions at CMHS in December 2010, when she was sixteen weeks pregnant, the records reflect that Mother did not meet with Dr. Jaffri until April 2011, when she was thirty-six weeks pregnant. Moreover,

4

After Child was born, Mother was prescribed several medications to treat her mental illness, including lithium, trazodone, and Visatril. In July 2011, Mother reported to her therapist that Father was complaining about her mood swings, and the therapist noted that, although Mother "is unaware of these mood swings[, she] thinks she needs to see the doctor more often or check herself into an inpatient setting for a medication evaluation." In early August 2011, Mother's medication was adjusted after she reported that she was experiencing insomnia, low energy, anger, mood swings, and paranoia. As of the date of trial, Mother was prescribed the following medications to treat bipolar disorder, depression, and anxiety: lithium, Lamictal, Vistaril, Abilify, and Wellbutrin. Chynwe Ahumaraeze, a psychiatric nurse practitioner with Comprehensive Mental Health Services (CMHS), who treated Mother since 2012, testified that Mother had been taking her medication continuously for at least the past year. However, records from CMHS suggest that Mother was not taking all of her medication as prescribed.

In December 2011, Mother told CMHS that she had full bottles of some medications but was running out of Visatril, even though she had always been given a month's supply of each medication. Also in December 2011, Mother told her therapist that she disagreed with the court's order that she attend ongoing therapy sessions in order to continue her medication. In March 2012, despite CMHS notes indicating that one of her medications was increased in January 2012, Mother reported that she had not been taking that medication and was not aware

during her April 2011 psychiatric evaluation with Dr. Jaffri, his notes stated that Mother "[i]nitially . . . gave the impression that[] she's off medicine due to pregnancy but then [Dr. Jaffri] found out she was off all her medicine six months prior to [becoming] pregnant and that was because she moved out of the Wyandotte County Mental Services catchment area and was living in Kansas City and really didn't call anybody to get any help." So, while Mother testified that Dr. Jaffri told her she was not allowed to take the medication she was on, it is clear from Dr. Jaffri's notes that Mother had not been on any medication for some period of time prior to her first appointment with Dr. Jaffri. Dr. Jaffri noted further that "[c]onsidering patient is 36 weeks pregnant and will be delivering within two weeks, no medicine is prescribed at this time. She was advised to call the office as soon as she has the baby so we can start her on medication."

of its increased dosage. In November 2012, Mother reported having an excess of Visatril and told Nurse Ahumaraeze that she believed the amount she was currently taking was sufficient.

Mother has a well documented and lengthy history of suffering from auditory hallucinations. In May 2009, Mother reported "that she had heard voices since her teenage years, and that most of those voices had directed her to do things." Additionally, although Mother denied ever acting on it, she reported "that when she was with the children . . . she used to hear a whisper telling her to drown [them]." Mother also reported that she was "subject to blackout spells" and had recently heard her grandmother's voice "telling her that she was worthless, better off with no children and that the kids where holding her back[,]" and, she noted, "'[t]he voice wanted [her] to bang [her] head against the window.'"

In June 2011, shortly after Child was born, Mother told her therapist that she had been hearing "whispers" but that she could not discern any words. On August 15, 2011, while bathing Child during a supervised visit, Mother heard a voice directing her to drown Child. Mother did not harm Child and reported the incident to CMHS.[7] At the end of August 2011, Mother

---

[7] Mother testified that after hearing the voice, she left the bathroom and asked Father (who was also at the visit) to watch Child. Mother testified further that she "immediately" reported the incident to her parent aide, Carmen Lovelace. Mother also testified that she called the nurse hotline and went to CMHS "as soon as [she] reasonably could" to address the auditory hallucinations. Lovelace testified that Mother told her about the bathtub incident "immediately" and that she advised Mother to contact her doctor. The submitted exhibits, however, provide a distinctly different timeline related to this incident and when it was reported by Mother.

Lovelace's notes from the August 15, 2011 visit reflect that she supervised as Mother bathed and dressed Child; there is no mention of any auditory hallucinations being reported. On August 16, 2011, the notes from Mother's therapy session at CMHS do not mention any report of recent auditory hallucinations; however, in that same session, Mother told her therapist that "she has had good visits with her son lately." CMHS records show that it was not until Mother met with her psychiatric nurse practitioner on August 29, 2011, that she mentioned the bathtub incident. During this session with the nurse practitioner, "[s]he reported that voices tell her to harm her 3-month[-]old baby and the voices are triggered by bathwater only." The notes also indicated that Mother's Abilify, medication prescribed to treat her auditory hallucinations, was discontinued in July 2011, at Mother's request. It was not until after the August 29, 2011 appointment that Mother's Abilify prescription was refilled. Additionally, Lovelace's own notes reflect that it was not until August 29, 2011, that Mother called Lovelace and reported that she heard voices during her last visit, on August 15, 2011. On August 29, 2011, Mother told Lovelace that she believed the water triggered the voices and she had called her father after the incident to talk about it. Mother also told Lovelace that she gave her doctor permission to contact Lovelace. Lovelace's notes then reflect that Mother's doctor contacted Lovelace after Lovelace talked to Mother and the doctor informed her of the situation, telling

6

requested an adjustment to her medication in order "to help with voices," at which time she was prescribed Abilify. In January 2012, Mother reported that she heard voices after a visit with Child was cancelled by the Division.[8] Nurse Ahumaraeze also testified that he adjusted Mother's Abilify prescription in late 2012 because she reported hearing voices again.

Dr. Sisk's report noted that auditory hallucinations telling a person to kill someone meet the "criteria for a command hallucination, in which persons are compelled to act by voices." He noted that "[a]n individual experiencing command hallucinations is probably not safe to be a caretaker, especially when the voices are threatening to the children."

Records from CMHS provide additional evidence of Mother's ongoing struggle with mental illness. In June 2011, Mother told her parent aide that "she can tell when someone is bleeding without actually seeing them . . . [because] she can taste it in her mouth." In October 2011, Mother reported hearing knocking while she was in the shower, but noted that, when she got out, there was no one there. In May 2012, Mother called the nurse hotline and reported that she was disoriented and had woken up from a nap thinking she was seventeen years old again. In February 2013, Mother reported that her anxiety was increased and she was experiencing "irrational fears of the dark" making her feel "anxious [about] going out of her room[,] especially at nighttime." The clinical social worker's written report from February 27, 2013, indicated that Mother reported crying every night. Shortly before trial, Mother told her clinical social worker "that there was a ghost in her house, and it was important for the ghost to move."

When asked if bipolar disorder is a permanent condition, Dr. Sisk stated that it is not "defined specifically that way." He went on to note that "[c]ertain people are able to take

---

Lovelace that they "wanted to make [her] aware of this serious situation" and they wanted to make sure that Mother was always supervised when she was with Child.

[8] The cancellation was due to circumstances within the Division, not due to Mother's own circumstances. At trial, Mother testified that she later realized that missing a visit made her depressed and that the "voice" she heard was actually her own internal voice.

medications and go to therapy and largely overcome the symptoms . . . [, b]ut generally it's considered an enduring kind of condition that a person may struggle with throughout the lifespan." Dr. Sisk also noted that "[t]he treatment of choice for all personality disorders [like Mother's] is long[-]term individual psychotherapy. It is not like schizophrenia or bipolar disorder or anxiety disorders [for] which there's often a chemical way to manage those symptoms." Nurse Ahumaraeze testified that he believed "that if somebody is diagnosed with bipolar [disorder], it's a permanent condition while the individual is suffering, but that some people do report getting better."

Mother's visitation with Child has always been supervised. Starting in June 2011, a parent aide, Carmen Lovelace, supervised visits in Mother's home. Lovelace testified that Mother always had toys, diapers, and food for Child during the visits and Mother was able to take care of Child's basic needs in Lovelace's presence. Lovelace testified that she had two main safety concerns related to Mother's parenting of Child. First, she was concerned when Mother reported that she had heard voices telling her to drown Child in August 2011. Second, in December 2011, Mother failed to buckle Child into his car seat.[9] Lovelace, who was driving Mother and Child at the time, had instructed Mother on how to use the car seat, and Mother told Lovelace that she had, in fact, buckled Child into the seat. Lovelace realized Child was not properly buckled after they were already driving; Lovelace immediately stopped the car and secured Child into his car seat. Later that day, Mother, who was "really upset," called Lovelace and said that she "realized what she had done." Becki Mosby, another Division worker, however, testified that Mother told her that she did not buckle Child into the seat because "they were cold and she didn't want to be cold, so she just put the baby in the car."

---

[9] Lovelace testified that the December 2011 visit was the only time they had a visit outside of Mother's apartment.

Lovelace noted that, initially, Mother was very nervous when Child cried and was easily frustrated during visits. In a March 2012 report, Lovelace noted that "[i]t doesn't take much for [Mother] to become easily frustrated if the baby isn't hungry, doesn't want to go to sleep after his bath, etc.[; and, o]n numerous occasions, [Mother] has asked me to hold the baby while she settles herself down." Lovelace believed that Mother loves Child and "does the absolute best that she can do at this time in her life"; ultimately, however, Lovelace could not recommend that the Child be placed in Mother's custody.

In a December 27, 2012 written report to the Division, Susan Saracheck, a social worker who began seeing Mother in July 2011, stated that she was concerned that "bonding ha[d] not really occurred" between Mother and Child. She concluded further that, although Mother had shown some growth, Saracheck "could not recommend that [Child] be reunited with [Mother]." Saracheck noted that "[t]here are still too many 'ifs' in [Mother's] life to give a child a safe place to grow up." At trial, Saracheck testified that there had not been any significant change from the end of December to the end of February.

From July 2012 until February 2013, Mother's case was handled by Division case worker Nicole Davis. Davis never recommended unsupervised visitation. In February 2013, Davis noted that, although progress had been made, she did not recommend that Child be placed in Mother's custody.[10] Davis testified that Child had been in the same foster home since at least July 2012 and needed "a stable loving environment" and someone who could provide for his needs at this time in his life. Davis noted that there were no additional services that could be provided to Mother to bring about reunification because Mother had already participated in all available services.

---

[10] The caseworker that replaced Davis, Joshua Brinkley, also did not recommend returning Child to Mother's custody.

Saracheck also noted Mother's lack of social support. She stated that "[a] single mother absolutely needs more than just one person . . . to take care of a baby." Mother's support network, other than Father, included a friend who started helping Mother in the summer of 2012, after Mother became the payee for her disability benefits.[11] Mother testified that her support network also included an aunt and uncle and other family members who "are all the way around [her]." Mother's aunt and uncle live eighty miles away, and despite her testimony regarding other family members, Mother provided no additional evidence regarding anyone living nearby. Moreover, the evidence suggested that Mother had a strained relationship with her mother and at least one of her sisters. Additionally, as noted, *supra*, Mother's father and stepmother live in Illinois.

Mother's only source of income is $710 a month in social security disability benefits that she started receiving in 2009 after being diagnosed with bipolar disorder. Mother also receives food stamps. Mother's monthly rent in subsidized housing is $130. Mother was not employed at the time of trial, but she testified that she planned to look for a job after obtaining her high-school diploma.[12] Mother believed that she could obtain her diploma by fall 2013. It appears that Mother has not been employed since 2008. And, although she reported to her parent aide in July and August 2011 that she was actively seeking employment, she also told her therapist in December 2011 that she did not want to work.

---

[11] Until the summer of 2012, Mother was not the payee and, at least for some period of time, Father was the payee of Mother's disability benefits. Mother sought to become her own payee after the termination case was filed.

[12] The Division service agreements required Mother to obtain a GED and employment. Mother testified that she took the GED exam but did not pass. After failing the exam, Mother decided to take classes through an online high school in order to obtain her diploma.

On May 20, 2013, the trial court issued its findings and judgment terminating Mother's parental rights pursuant to sections 211.447.5(2), (3), and (6).[13] The court also found that termination was in the best interests of Child. Mother now appeals.

**Standard of Review**

A decision to terminate parental rights is a two-step process. First, there must be clear, cogent, and convincing evidence of the statutory grounds for termination. *In re B.H.*, 348 S.W.3d 770, 772 (Mo. banc 2011); *see also In re S.M.H.*, 160 S.W.3d 355, 362 (Mo. banc 2005) ("The presence of evidence to support one statutory ground for termination is sufficient to terminate a parent's rights."). "Clear, cogent, and convincing evidence is evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *S.M.H.*, 160 S.W.3d at 362. If a statutory ground for termination exists, the second step requires a showing by a preponderance of the evidence that the termination is in the child's best interests. *B.H.*, 348 S.W.3d at 774. The best interest determination is reviewed for an abuse of discretion. *In re P.L.O.*, 131 S.W.3d 782, 789 (Mo. banc 2004).

We will affirm the trial court's judgment "unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law." *In re C.W.*, 211 S.W.3d 93, 99 (Mo. banc 2007). "As a practical matter, this means the judgment will be reversed 'only if we are left with the firm belief that the order was wrong.'" *S.M.H.*, 160 S.W.3d at 362 (quoting *In re T.G.*, 965 S.W.2d 326, 332 (Mo. App. W.D. 1998)). Additionally, we defer to the trial court's credibility determinations, and conflicting evidence is "reviewed in the light most favorable to the judgment of the trial court." *Id.* "'Greater deference is granted to

---

[13] All statutory references are to the Missouri Revised Statutes 2000, as updated through the 2011 Cumulative Supplement, unless otherwise noted.

11

a trial court's determinations in custody . . . proceedings than in other cases.'" *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 815 (Mo. banc 2011) (quoting *In re S.L.N.*, 167 S.W.3d 736, 741 (Mo. App. W.D. 2005)).

## Analysis

Mother raises four points on appeal. First, she claims that the trial court erred in terminating her parental rights under section 211.447.5(2)(a)-(d) based on her mental illness in that the findings are not supported by the evidence and the court failed to make the following legally required findings: (1) that Mother harmed Child or was likely to harm him in the future; (2) a causal connection between Mother's mental illness and harm to Child; and (3) how Mother's mental illness affects her present and future ability to parent Child. In her second and third points, Mother claims that the trial court erred in terminating her parental rights under sections 211.447.5(3) and 211.447.5(6) in that the findings are legally insufficient, not supported by the evidence, and there was no finding of a "specific dangerous condition." Fourth, Mother claims there is insufficient evidence to support a finding that termination was in Child's best interests. Because we find clear, cogent, and convincing evidence to support termination under section 211.447.5(3) (Point II), and evidence supporting one statutory ground for termination is sufficient to affirm the judgment, *S.M.H.*, 160 S.W.3d at 362, we do not address the additional statutory grounds for termination challenged in Points I and III.

## I.    Section 211.447.5(3) – Failure to Rectify

Mother claims that termination under section 211.447.5(3) is not supported by clear, cogent, and convincing evidence; the findings are legally insufficient; and the court failed to make the required finding of a specific dangerous condition.

Under section 211.447.5(3), a court may terminate parental rights if

[t]he child has been under the jurisdiction of the juvenile court for a period of one year,[14] and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

The court must also consider and make findings on the following:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
(c) a mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child necessary care, custody and control;
(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody, and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody, or control.

§ 211.447.5(3)(a)-(d).

Thus, the analysis under section 211.447.5(3) is two-fold. "First, the trial court must determine whether the conditions that originally justified the court's jurisdiction exist, or new potentially dangerous conditions presently exist." *In re L.J.D.*, 352 S.W.3d 658, 674 (Mo. App. E.D. 2011). "Second, the trial court is required to consider and make findings under each of the four [factors]." *Id.* Each factor is not a separate ground for termination but is a category the court must consider with all other relevant evidence. *Id.* "In other words, the [factors] provide an organizational framework through which the trial court examines much of the evidence in order to determine whether the parent has failed to remedy a condition, and whether that failure

---

[14] It is not disputed that Child has been under the jurisdiction of the juvenile court for more than one year.

13

is likely to continue." *Id.* Additionally, "[w]hile the trial court is statutorily required to make specific findings on each factor . . . , these findings are not a substitute for an articulated finding of the presence of a dangerous condition." *Id.* Moreover, "[t]he disability or disease of a parent shall not constitute a basis . . . for the termination of parental rights without a specific showing that there is a causal relation between the disability or disease and harm to the child." § 211.447.10. Thus, when termination is based on a parent's mental illness, courts must "take great care to identify a causal connection between the disability and harm to a child before terminating parental rights." *L.J.D.*, 352 S.W.3d at 665.

Here, the trial court found both that the conditions which led to the assumption of jurisdiction still persisted and that conditions of a potentially harmful nature existed. The court found that, after nearly two years of services provided by the Division, in addition to the services offered when Brother was removed, Mother could not demonstrate that she was capable of safely parenting Child. The court noted Mother's lack of insight regarding the severity of her situation and her ongoing struggles with mental illness. The court found that Mother demonstrated difficulty managing Child's behaviors; suffered from mood swings; and was easily frustrated or irritated by Child. The court noted that Mother's parenting skills had not improved to a point where she was able to have unsupervised visitation; she remained dependent on others for transportation; and her only source of financial security was social security disability benefits.

Child was taken into Division custody shortly after his birth because Brother's case was still pending. The Division alleged that Child was in need of care due to Mother's neglect of her other two children. The allegations also noted Mother's mental illness and her failure to take medication or comply with regular therapeutic treatment. It is clear that Mother's mental illness was a significant factor in the trial court's decision to terminate her parental rights. Additionally,

14

Mother's mental illness is directly related to the existence of potentially dangerous conditions and Mother's inability to safely parent Child.

Mother has bipolar disorder (mixed type with psychotic features), mixed personality disorder (with antisocial and borderline features), generalized anxiety disorder, and depression. Mental illness as the basis for termination is analyzed using three prongs: "(1) documentation—whether the condition is supported by competent evidence; (2) duration—whether the condition is permanent or such that there is no reasonable likelihood that it can be reversed; and (3) severity of effect—whether the condition is so severe as to render the parent unable to knowingly provide the child necessary care, custody and control." *In re K.A.W.*, 133 S.W.3d 1, 14 (Mo. banc 2004). "A mere finding of even severe mental illness is insufficient" to support termination. *L.J.D.*, 352 S.W.3d at 664. "A termination of parental rights on grounds of mental illness requires substantial evidence that the incapacity is so severe that it renders the parent incapable of providing minimally acceptable care." *Id.* Moreover, even a finding that a parent is unable to provide the necessary care may be insufficient to support termination based on mental illness "if the parent has access to additional support because parenting is frequently 'a group effort.'" *Id.* (quoting *In re A.S.W.*, 137 S.W.3d 448, 453 (Mo. banc 2004)).

There is no dispute that Mother suffers from mental illness. Her diagnosis was well documented and she continues to receive extensive treatment. Thus, the existence of Mother's mental illness is supported by competent evidence.

It is also clear from the record that Mother's mental illness is a serious, long-standing condition that will not likely be remedied in the near future. Mother has suffered from mental illness since childhood and continues to report mood swings, paranoia, depression, anxiety, and auditory hallucinations. Mother began taking medication in 2008, she did not take the

medication consistently, and she stopped taking all medication approximately six months before becoming pregnant with Child. Since Child's birth, the record reflects that Mother has been continuously taking several medications, although there is evidence that she does not always take them as prescribed. Moreover, Dr. Sisk testified that, although bipolar disorder is not specifically defined as a permanent condition, it is an enduring condition a person may struggle with for her entire life. Dr. Sisk also testified that long-term individual psychotherapy is the treatment of choice for Mother's personality disorder.

As noted, Mother reported multiple symptoms to her treatment provider over the past two years, including auditory hallucinations. Mother began having auditory hallucinations when she was a teenager and continues to suffer from them. In May 2009, Mother reported that whispers told her to drown her children and her grandmother's voice told her she was worthless and directed her to bang her head against a window. In June 2011, Mother again reported hearing whispers, but she could not make out what they were saying. Then, in August 2011, while bathing Child during a supervised visit, Mother heard a voice directing her to drown him. In January 2012, Mother again reported hearing voices. And, as recently as December 2012, (approximately four months before trial) Mother's medication to treat her auditory hallucinations was adjusted. According to Dr. Sisk, a parent who hears voices directing her to cause harm to her children is not safe to act as a caretaker.

Based on the well documented history of persistent, serious symptoms, the evidence supports a finding that Mother's mental illness is a permanent condition or one that is not reasonably likely to be reversed, as well as a finding that, under the circumstances, Mother's mental illness renders her unable to provide Child with the care, custody, and control he requires.

Before terminating Mother's parental rights, the trial court also considered and made sufficient findings on all four statutory factors. The court found that Mother failed to make progress in complying with the social service plans, noting that she had not earned unsupervised visitation and, after two years of parent aide assistance, there was no recommendation for unsupervised visitation. *See* § 211.447.5(3)(a). The court found that Mother failed to adjust her own circumstances in order to provide a proper home for Child, noting again that she had not earned unsupervised visitation, did not have reliable transportation, continued to rely on the parent aide to assist with Child during visits, and her financial situation appeared insufficient to care for herself and Child as she was solely dependent on her social security disability benefits and showed no plan to seek employment. *See* § 211.447.5(3)(b). The court found that Mother's mental illness was permanent, or such that there is no reasonable likelihood that the condition could be reversed, and that it rendered her unable to knowingly provide the necessary care, custody, and control for Child. § 211.447.5(3)(c). In its order, the court referenced many of the symptoms and incidents, including the auditory hallucinations noted in this opinion, and the court also indicated that Mother's history of noncompliance with her prescriptions exacerbated her condition. The trial court found no evidence that Mother had a substance abuse problem. § 211.447.5(3)(d).

Mother's service plans included the following goals: obtain her GED, gain employment, improve parent/child interactions, and remain medication compliant. The court ordered Mother to participate in individual therapy and couples counseling, complete a psychological evaluation, work with a parent aide, and attend parenting classes. Mother complied with nearly all of the service plan terms and court orders, although she was not able to obtain her GED and she did not gain employment. While she is currently working toward earning a high-school diploma and

17

testified that she would seek employment once she accomplished that goal, Mother has not been employed since 2008 and reported to her therapist in December 2011 that she did not want to work.

Although Mother demonstrated some improvement in her interactions with Child, all of her visits remain supervised, and the Division has not recommended that she regain custody or have any unsupervised visits.[15] Moreover, Mother's case worker testified that there are no additional services available for Mother to assist her in regaining custody as all those available have already been offered. Mother is also without transportation or a sufficient support network to help her care for Child. Although Mother maintains her own apartment, she is not employed and her only source of steady income is from social security disability benefits. Additionally, Brother still lives in Illinois in the guardianship of Mother's father and stepmother, and Mother has not seen him since the summer of 2010. And, although Mother testified that she has joint custody of Sister, she has not seen her since August 2012 due to a lack of transportation.

As discussed, *supra*, despite Mother's best efforts over the past two years, she continues to struggle with mental illness, and while she is prescribed medication and attending regular therapy, her symptoms persist. Mother's auditory hallucinations directing her to harm Child are particularly concerning. Although Mother claimed that the August 2011 incident was isolated, there is ample evidence that she continues to struggle with auditory hallucinations. There is also evidence that Mother does not take her medication as prescribed and adjusts her dosage without prior consultation. Mother has been in treatment at CMHS since she was four months pregnant

---

[15] We recognize that because she has never been granted any unsupervised visitation with Child, it is difficult for Mother to demonstrate that she has rectified the situation that led to the Division taking custody of Child. However, while we note that this is a difficult position for a parent to be in, we also recognize that some circumstances, like Mother's, do not support unsupervised visitation due to the serious concerns related to a child's health and safety. Thus, it is not necessary for the Division to grant unsupervised visitation before a court can make a determination as to whether the conditions that led to jurisdiction persist or other potentially harmful conditions continue to exist.

with Child, yet, even when she is taking her medication, she continues to have symptoms that pose a safety risk to Child.

Mother argues that the trial court erroneously focused exclusively on her past acts, not her present circumstances. While we recognize that past acts, alone, cannot support termination, "[p]ast behavior can support grounds for termination . . . if it is convincingly linked to predicted future behavior." *K.A.W.*, 133 S.W.3d at 9-10. "There must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm." *Id.* at 10. Mother has a history of mental health issues dating back to her childhood. For at least the past ten years, she sought medical help for these conditions, yet she continues to have symptoms that pose a safety risk to Child. Despite Mother's reports that she is free from auditory hallucinations, the record indicates otherwise. Thus, while it is fortunate that Mother has not harmed her children, her past behavior and ongoing symptoms indicate a likelihood of future harm.

Mother also relies heavily on *L.J.D.* and argues that the trial court failed to find a causal connection between her mental illness and harm to Child. In *L.J.D.*, the court correctly noted that section 211.447.10 requires the trial court to "identify a causal connection between the disability and harm to a child before terminating parental rights." 352 S.W.3d at 665. No causal connection existed in *L.J.D.* because the evidence supported a finding only that the mother had a mental illness, not that her mental illness affected her ability to parent or that the child would likely suffer any harm. *Id.* Additionally, there was no evidence that the parenting deficiencies identified would not be improved with further support and services. *Id.* at 665. Unlike the facts in *L.J.D.*, here, the evidence supports a finding that Mother's parenting deficiencies were a product of her mental illness, and that, despite receiving extensive services, these deficiencies had not sufficiently improved.

19

Mother received extensive mental health and social services not only since Child's birth in 2011, but since 2009 when parenting issues came to light regarding Brother. Despite these services, Mother's visits remained supervised due to safety concerns directly related to her mental illness and behavior toward Child. Mother's case worker indicated there are no additional support services available to assist Mother in her attempt to regain custody. Further, Mother lacks a support network and relies primarily on Father, whose parental rights were also terminated, and a friend for help. Her friend assists with transportation; however, there is no evidence that this friend is willing or able to assist with childcare if Mother's symptoms return while Child is in her care. Under the circumstances, given the trial court's detailed findings regarding Mother's history with mental illness, her current condition, and the risk she poses to Child, we find sufficient evidence of an identified causal connection between Mother's mental illness and the likelihood of harm to Child.

Additionally, we find clear, cogent, and convincing evidence that the conditions that led to Child being placed in Division custody persist, "conditions of a potentially harmful nature continue to exist, [and] . . . there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to [Mother] in the near future." § 211.447.5(3). The symptoms Mother suffers from due to her mental illness clearly pose a safety risk to Child, and Mother's auditory hallucination in August 2011 was not an isolated incident. The trial court clearly documented its safety concerns related to Mother's mental illness, specifically her history of auditory hallucinations, and the fact that, after nearly two years of services provided by the Division, Mother had not demonstrated that she could safely care for Child. Thus, the trial court's findings sufficiently articulated the presence of a dangerous condition. Additionally, Brother remains in Illinois, and there is no evidence that Mother has attempted to regain custody;

and Mother has not seen Sister, who lives in Lee's Summit, since August 2012 due to a lack of transportation. Therefore, we find that there is substantial evidence to support termination under section 211.447.5(3).

Point II is denied.

**Best Interests of the Child**

"A trial court's determination regarding whether termination of parental rights is in the best interest of the child is a subjective assessment based on the totality of the circumstances." *L.J.D.*, 352 S.W.3d at 662. When making this determination, "the court shall evaluate and make findings on the following factors, when appropriate and applicable to the case": (1) the child's emotional ties to the parent; (2) the regularity and extent of a parent's visitation and contact with the child; (3) financial support provided by a parent who is able to pay such support; (4) whether additional services exist that are likely to enable return of the child to the parent's custody in an ascertainable amount of time; (5) the parent's interest in and commitment to the child; (6) whether the parent has any felony convictions that would deprive the child of a stable home; and (7) deliberate acts by the parent that create a substantial risk of physical or mental harm to the child. § 211.447.7(1)-(7). Because each case is unique, there is no requirement that all seven factors be present to support a finding that termination is in the child's best interests. *See In re B.J.H.*, 356 S.W.3d 816, 834 (Mo. App. W.D. 2012).

At the time of trial, Child had been in Division custody for nearly two years, and, during that time, while Mother had supervised visits two to three times per month, a bond had not been fully established between Mother and Child. Due to Mother's ongoing struggles with mental illness, she had not been granted any unsupervised visits, she continued to require guidance from a parent aide, and her visitation time during each visit had not been increased. Mother, herself,

21

when asked if she believed she could safely parent Child on her own, responded that, although she believed she could, she would first "need more bonding time." Additionally, although Mother was prepared for her supervised visits, she did not provide any other support, financial or otherwise, for the care of Child. And, despite reporting to her parent aide on at least two occasions that she was looking for work, Mother did not demonstrate a desire to work. All available services had been provided to Mother, yet, as of the date of trial, there was no recommendation that she regain custody of Child and her visits remained supervised. Mother continues to struggle with serious mental illness, and although she has been treating the symptoms with medication and therapy, her symptoms persist. On more than one occasion, Mother has experienced auditory hallucinations directing her to harm her children. Therefore, the evidence supports a finding that Mother's mental illness creates a substantial risk of harm to Child. The trial court did not abuse its discretion in finding that termination was in Child's best interests.

Point IV is denied.

### Conclusion

Because we find clear, cogent, and convincing evidence to support the termination of parental rights under section 211.447.5(3), and substantial evidence supporting the trial court's determination that termination is in the child's best interests, we affirm the judgment of the trial court. As one statutory ground for termination exists, we deny Mother's Points I and III without reaching the merits.

_____
Karen King Mitchell, Judge

Cynthia L. Martin, Presiding Judge, and
Mark D. Pfeiffer, Judge, concur.

22